UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

  UNITED STATES OF AMERICA,

                                     19 CR 410 (FB)

           -against-

  RODOLFO GARCIA,

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X


**DEFENDANT RODOLFO GARCIA'S**

**POST-HEARING MEMORANDUM OF LAW**

**IN SUPPORT OF THE MOTION**

**TO SUPPRESS PHYSICAL EVIDENCE**


New York, New York
July 8, 2021

VLADECK RASKIN & CLARK, P.C.
By Susan J. Walsh
565 Fifth Avenue, 9th Floor
New York, New York 10017
(212) 403-7300
*Attorneys for Rodolfo Garcia*

To:
      United States Attorney for the EDNY
          Jonathan Siegel, AUSA
          Genny Ngai, AUSA

# TABLE OF CONTENTS

TABLE OF AUTHORITES ..................................................................................................ii

PRELIMINARY STATEMENT ........................................................................................1

STATEMENT OF FACTS..................................................................................................2

ARGUMENT.....................................................................................................................15

I.      LAW ENFORCEMENT'S WARRANTLESS ENTRY INTO THE GARCIA APARTMENT CLOSE TO MIDNIGHT ON JUNE 28TH WITHOUT CONSENT AND SUBSEQUENT SEARCHES OF THE GARCIA HOME WERE UNLAWFUL AND VIOLATED THE FOURTH AMENDMENT TO THE UNITED STATES CONSTITUTION..................................................................................................16

      A.    Law Enforcement Entered and Searched the Garcia's Apartment on June 28, 2019, Without a Warrant or Consent ...............................................................17

           1.    Argila's Purposeful Failure to Activate His NYPD Issued Body-Worn-Camera Demonstrates that Argila's Version of Events is Not Credible ...18

           2.    Argila's Purposeful Failure to Activate His BWC Warrants an Adverse Inference Against the Credibility of His Account....................................21

      B.    The Plain View Exception to the Warrant Requirement Does Not Apply............26

      C.    The Government Has Failed to Meet Their Burden of Demonstrating that Ms. Garcia Signed the Consent Form on June 29th Knowingly, Freely and Voluntarily ....................................................................................................................28

           1.    Any Consent is Invalid Because of Law Enforcement Unlawfully Searched Ms. Garcia's Apartment the Night Before................................30

           2.    Ms. Garcia's Signed Consent Was Involuntary and Uninformed.............31

II.     THE GOVERNMENTS REQUEST TO SEAL THE PRE-HEARING MOTION CONCERNING GIGLIO AND RELATED TO LAW ENFORCEMENT CONDUCT INCLUDING BUT NOT LIMITED TO INTERNAL DEPARTMENTAL DISCIPLINE, CCRB COMPLAINTS AND CIVIL SUITS SHOULD BE DENIED .33

CONCLUSION...................................................................................................................35

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Arizona v. Hicks*,
   480 U.S. 321 ...................................................................................................................27

*Bumper v. North Carolina*,
   391 U.S. 543 (1968) ................................................................................................ 16, 29

*Caniglia v. Strom*,
   141 S. Ct. 1596 (2021) ..................................................................................................15

*Cauble v. Mabon Nugent & Co.*,
   594 F. Supp. 985 (S.D.N.Y. 1984) ...............................................................................14

*Georgia v. Randolph*,
   547 U.S. 103 (2006) ......................................................................................................30

*Horton v. California*,
   496 U.S. 128 (1990) ................................................................................................26, 27

*Ishay v. City of New York*,
   No. 96-CV-5829 FB, 2000 WL 1140437 (E.D.N.Y. Aug. 8, 2000) ..................................26

*Kentucky v. King*,
   563 U.S. 452 (2011) ................................................................................................ 15, 26

*McCord v. Reardon*,
   No. 20-CV-2005 (EK), 2020 WL 5342637 (E.D.N.Y. Sept. 4, 2020) .................................34

*Minnesota v. Dickerson*,
   508 U.S. 366 (1993) ................................................................................................27, 28

*Payton v. New York*,
   445 U.S. 573 (1980) ......................................................................................................16

*People v. Yarborough*,
   64 Misc.3d 1209(A), 2019 WL 2896694 (N.Y. Sup. Ct. July 2, 2019) ................................24

*Schneckloth v. Bustamonte*,
   412 U.S. 218 (1973) .............................................................................................. 15, 17, 30

*Steagald v. United States*,
   451 U.S. 204 (1981) ......................................................................................................15

*U.S. v. Yevakpor*,
   419 F.Supp.2d 242 (N.D.N.Y. 2006) ............................................................................25

*Uniformed Fire Officers Ass'n v. de Blasio*,
    973 F.3d 41 (2d Cir. 2020) ........................................ 35

*United States v. Agapito*,
    620 F.2d 324 (2d Cir. 1980) ...................................... 16

*United States v. Anderson*,
    452 F.3d 66, 77 (1st Cir.2006) ................................... 14

*United States v. Arms*,
    No. 01-CR-286(FB), 2002 WL 32781 (E.D.N.Y. Jan. 14, 2002 Block, DJ) ........................ 28

*United States v. Barone*,
    721 F. Supp. 2d 261 (S.D.N.Y. 2010) ........................... 31

*United States v. Basciano*,
    No. 03-CR-929, 2010 WL 1685810 (E.D.N.Y. Apr. 23, 2010) ............................ 34

*United States v. Bushay*,
    859 F. Supp. 2d 1335 (N.D. Ga. 2012) .......................... 31

*United States v. Calandra*,
    414 U.S. 338 (1974) .............................................. 15, 16

*United States v. Griffin*,
    No. 18-CR-100-PP, 2018 WL 4929397 (E.D. Wis. Oct. 11, 2018) ........................ 23

*United States v. Guzman*,
    724 F. Supp. 2d 434 (S.D.N.Y. 2010) ........................... 33

*United States v. Hamilton*,
    334 F.3d 170 (2d Cir. 2003) ...................................... 14

*United States v. Isiofia*,
    370 F.3d 226 (2d Cir. 2004) ..................................... 30, 33

*United States v. Key*,
    No. 98-CR-446 ERK, 2010 WL 3724358 (E.D.N.Y. Sept. 15, 2010) ................... 34

*United States v. Lavan*,
    10 F. Supp. 2d 377 (S.D.N.Y. 1998) ............................ 15

*United States v. Lawson*,
    961 F. Supp. 2d 496 (W.D.N.Y. 2013) ......................... 18, 21

*United States v. Lee*,
    660 F. App'x 8 (2d Cir. 2016) ................................... 27

*United States v. Long Huang You*,
198 F. Supp. 2d 393 (S.D.N.Y. 2002) ...............................................................32

*United States v. McKeever*,
169 F.Supp. 426 (S.D.N.Y.1958) ......................................................................14

*United States v. Medico*,
557 F.2d 309 (2d Cir. 1977) .............................................................................31

*United States v. Medina*,
451 F.Supp.2d 262 (D. Mass. 2006) .................................................................17

*United States v. Munoz*,
987 F. Supp. 2d 438 (S.D.N.Y. 2013) ..........................................................31, 33

*United States v. Patzer*,
277 F.3d 1080 (9th Cir. 2002) ...........................................................................33

*United States v. Ramirez*,
115 F. Supp. 2d 401 (S.D.N.Y. 2000) ...............................................................17

*United States v. Sanchez*,
635 F.2d 47 (2d Cir. 1980) .......................................................................16, 29, 32

*United States v. Strachon*,
354 F. Supp. 3d 476 (S.D.N.Y. 2018) ...............................................................17

*United States v. Tillard*,
No. 18-CR-6091-FPG, 2020 WL 57198 (W.D.N.Y. Jan. 6, 2020)...........21, 22, 23

*United States v. Tillard*,
No. 18-CR-6091-FPG-JWF, 2019 WL 8105894 (W.D.N.Y. Oct. 4, 2019)..............21, 22, 23

*United States v. Wilson*,
11 F.3d 346 (2d Cir. 1993) ...........................................................................29, 31

*Walls v. City of New York*,
502 F. Supp. 3d 686 (E.D.N.Y. 2020)............................................................23, 34

*Wong Sun v. United States*,
371 U.S. 471 (1963) ...........................................................................................35

**Statutes**

18 U.S.C. § 922(g)(1)...........................................................................................15

18 U.S.C. § 924(a)(2)...........................................................................................15

18 U.S.C. § 3551 et seq.........................................................................................15

N.Y. Exec. Law § 234 (McKinney 2021) ...................................................................24

New York Civil Rights Law § 50-a ..........................................................................35

**Other Authorities**

Fed. R. Evid. 608 .......................................................................................................13

Fed. R. Evid. 901 .......................................................................................................14

Jonathan Abel, *Brady's Blind Spot: Impeachment Evidence in Police Personnel
Files and the Battle Splitting the Prosecution Team*, 67 STAN. L. REV. 743,
789 (2015)............................................................................................................ 34, 35

New York Committee Report, NY S.B. 8493 ...........................................................24

United States Constitution, Amend. 4.......................................................................27

The fundamental question this Court must decide is if it is credible that a 65-year-old woman, with a fourth-grade education, who speaks no English, who has been medicated for anxiety for decades and has not worked outside of the home in 30 years would usher into her apartment a plain clothed male officer close to midnight while she was home alone? Or, whether an armed 13-year veteran of the Anti-Crime Unit would shove past her at the threshold into the woman's home to look around and investigate a 911 report of shots fired outside her home?

What tips the balance in favor of Ms. Garcia's sworn account is not only that it is more probable, but also that the officer who is equipped with NYPD issued body-worn-camera to reinforce police accountability and reduce the trust deficit with the public he polices, purposely opted not to activate his device to record at the critical moments of this encounter: when he first confronts Ms. Garcia at the threshold of her residence and as he tours the inside of the Garcia home – including its bedrooms, alone with Ms. Garcia. The manipulation of the body-camera footage the following day to purposely record only the moments Ms. Garcia puts her wobbly handwriting to the consent form and not a moment prior, suggests that the officer's decision not to record the encounter was not only purposeful but deceptive. It represents a cold calculation that the odds that a court would reject his account in favor of a member of the public are so low and the probability that a lay witness's word would be credited over his so unlikely, the risk of violating the mandates of the NYPD Patrol Guide is worth the gamble. The gamble to risk the NYPD Patrol Guide violation is particularly well calculated if the details of on-the-job violations are shielded by sealed filings and motions to preclude them into evidence.

Granted courts have been evaluating credibility of witnesses long before bodycams, iPhones or recording devices were invented. But today modern courts and modern law

enforcement have the tools to demonstrate their veracity or lack of it on tape. Indeed, public policies have evolved to the point where there is a duty to do so. To ignore the purposeful disregard of modern policing safeguards of both law enforcement and the public, mocks the moral and financial investment in safe policing. This hearing demonstrates that with or without her own body-worn-camera, Ms. Garcia's account of the events of June 28 and 29 are not only more credible, but they are also true. For these reasons and the reasons that follow, the evidence seized from the Garcia home in violation of the United States Constitution must be suppressed.

<u>STATEMENT OF FACTS</u>

Margot Garcia ("Ms. Garcia") had been living with her family including her adult son Rodolfo "Rudy" Garcia ("Rudy" or "Defendant") at 266 McKinley Avenue in a third-floor walk-up in Brooklyn for over ten years when police entered her home close to midnight on the night of June 28, 2019. (Defense Exhibit "DX" C (Affidavit of Margot Garcia)); Tr. 2 at 8).[1] Detective James Argila ("Argila"), Officer Kevin Morgan ("Morgan") and Officer Austrie Whirl ("Whirl"), all three of the Anti-crime Unit, among other law enforcement officers responded to that area pursuant to a report of a "possible robbery" and/or "shots fired." (Tr. 1 at 19, 109, 145, 154, 164, 175). Among the other officers who responded to the area around the Garcia home were Officer Justin Puccia ("Puccia") and his partner Officer Murphy ("Murphy"). (Tr. 1 at 145, 154). Puccia, a fourteen and half year New York City Police Department ("NYPD") veteran, having arrived first at the scene, relayed the information he gathered to the anti-crime unit Argila, Whirl and Morgan. (Tr. 1 146-47). No witness, named or anonymous, claimed to have seen anyone fire a gun, but

---

[1] "Tr" refers to the transcript of the suppression hearing conducted in this matter. "Tr 1" refers to the transcript of April 30, 2021, and "Tr. 2" refers to the continuation of the hearing conducted on May 19, 2021.

instead unnamed witnesses reported that they heard one fired and believed a suspect to be inside the building on McKinley Avenue on the second floor. *Id.*

Ms. Garcia, a 65-year-old woman born in Columbia with a fourth grade Columbian education was home alone when police entered her apartment that night investigating the reported robbery/shots fired. (Tr. 2 at 9). Ms. Garcia's native language is Spanish. (*Id.*). She cannot read English and can only speak a very little bit of English. (*Id.,* Tr. 1 at 10). None of the law enforcement officers who entered her home that that night spoke Spanish. (Tr. 1 at 10, 36, 158). Ms. Garcia, who was medicated for anxiety at the time had not worked outside the home for 30 years and was supported by Social Security Disability. (Tr. 2 at 9-10). At the hearing she testified that she had never testified before and that she was "scared" and understandably "nervous" during the police encounters that lasted over 12 hours in June 2019. (*Id.* at 15, 20).

According to Argila, as law enforcement was conducting a floor by floor search Ms. Garcia opened her third floor apartment door and signaled down to him to on the second floor, waved him into her apartment where she proceeded to tour him down the hall and into the bedrooms. (Tr. 1 at 9-10). He was the first officer inside her apartment and he went in alone. (Tr. 1 at 11). In contrast, according to Ms. Garcia, the plain clothed officer Argila came to her door, knocked very hard and shoved her as he entered her home that night and proceeded to search her private residence without receiving or ever requesting permission. (Tr. 2 at 13-14, 15; DX C (Nov. 2019 Affidavit of Margot Garcia)). Although Officer's Whirl, Morgan and Argila were all equipped with NYPD issued body-worn cameras ("BWC") that night and recorded portions of the events, when Argila entered the Garcia home alone and walked through her apartment claiming to make plain view observations of contraband, he purposely failed to activate his BWC. (Tr. 1 at 41-42). Accordingly, the only body camera footage of the entry into the home by law enforcement occurred

after Argila and other officers were already inside, when Whirl climbed the third-floor stairs and walked through the adjacent front door after a number of officers uniformed and plain clothed were already inside the apartment – indeed, already inside Rudy Garcia's bedroom. (Gov. Ex. 11 at 23:14:42). It is clear from the body-worn camera that was activated minutes later when law enforcement began to film, that officers, including uniformed Sergeant Lynch, (Tr. 1 at 107, Gov. Ex. 11 at 23:15:19-45), were already inside the bedroom and searching for evidence. (Gov. Ex. 11 at 23:15:19). In fact, Whirl was using a flashlight to search the bedroom in the BWC video. (Tr. 1 at 107, Gov. Ex. 11 at 23:15 (at 7:32 minutes)).

<u>Law Enforcement Unlawfully Enter and Search the Garcia's Apartment</u>

Late in the evening on June 28, 2019, the NYPD received a 911 dispatch of a call in which the caller claimed to have heard a robbery or gunshots near the cross streets of McKinley Avenue and Grant Avenue in the Cypress Hill neighborhood of Brooklyn. (Tr. 1 at 7, 145, 164). At approximately 11:00 pm, multiple NYPD officers responded to a radio transmission of shots fired and/or a possible robbery and began canvassing the area where the gunshots had been reported. (Tr. 1 at 7, 145, 164; (Gov. Ex. 11 at 23:08:06)).

At approximately the same time, Whirl's BWC video shows him, Argila, and Morgan entering the building at 266 McKinley Avenue. (Tr. 1 at 17 -19, Gov. Ex. 11 at 23:08:19). The officers bang on the door of the first-floor apartment but there appears to be no answer. (Gov. Ex. 11 at 23:09:25). Next, the video shows the officers proceeding up to the second floor, where they bang on the door of that apartment, shouting through the door. (Gov. Ex. 11 at 23:09:51). A woman comes to the door of the second-floor apartment and is later joined by a man and young person, who speak with the officers. (Gov. Ex. 11 at 23:11:03). Shortly thereafter, BWC footage shows

the back of Argila in a red shirt, walking upstairs, alone to the third-floor apartment. (Gov. Ex. 11 at 23:11:36).

The Government's witness Argila and Ms. Garcia offer starkly conflicting accounts of what happened next. According to Argila, when he arrived on the second floor, "there was a lady on the third floor who was leaning over a banister trying to say something to [the officers]." (Tr. 1 at 9). Argila claims that Ms. Garcia waved him into her apartment, and then proceeded to walk Argila down the hallway of her apartment. (*Id.* at 10-11). Argila acknowledged that Ms. Garcia speaks "very little" if any, English. (Tr. 1 at 10; Tr. 2 at 9, 15). Argila does not speak Spanish. (Tr. 1 at 10, 36).

However, Ms. Garcia has consistently stated under oath in writing and at the hearing that she never "waved" Argila into her apartment, she did not consent to his being there and that Argila shoved her out of the way as he entered her apartment. (Tr. 2 at 13-14, 15; DX. C). Furthermore, Ms. Garcia testified that after Argila pushed past her and entered her apartment, Argila asked her which room was her son's or words to that effect. (Tr. 2 at 13, 15). At no point did Argila even attempt to speak to Ms. Garcia in Spanish. (*Id.* at 14).

While BWC footage would have enabled this Court to see whether Ms. Garcia consented to Argila entering her apartment by waving him in, or if in fact he shoved his way past her and into her home, Argila, who has been with the NYPD for nearly 13 years, acting alone as he entered purposely did not activate his NYPD issued equipment – the body-worn-camera. (*See* Tr. 1 at 38-40). Argila acknowledged that he was wearing his BWC the night he entered Ms. Garcia's apartment. (*Id.* at 34). Furthermore, Argila testified that he was aware of the New York Police Department Patrol Guide ("NYPD Patrol Guide") and that it requires officers to activate their BWC under certain conditions, including when responding to shots fired or a robbery. (*Id.* at 36-

40). Nevertheless, despite Argila's awareness of the NYPD Patrol Guide's requirements for activating his BWC and keeping it recording during the duration of the encounter, Argila offered several thin excuses for why he elected not to activate his BWC at several pivotal moments in this encounter, including "because there were other officers already on the scene," that he "thought [he] was talking to a potential witness" and that he "didn't think that there was going to be any adversarial encounter" (*Id.* at 39-42, 109-110). While in response to the Court's question, Argila claimed that because his encounter was with a potential witness he did not activate his body camera when he engaged with Ms. Garcia, (Tr. 1 at 38-40), curiously, in contrast the entire encounter with the family on the second floor was recorded even though Argila himself stated he did not believe they "had anything to do with it" either. (Tr. 1 at 19, Gov. Ex. 11 at 23:11:03).

According to Argila, next Ms. Garcia walked Argila down the hallway of her apartment and brought him into two different bedrooms. (*Id.* at 11). Argila testified that he then turned around and started walking back up the hallway to leave Ms. Garcia's apartment when he noticed a third bedroom that he previously walked past, with its door partially opened. (*Id.* at 11-12). Argila claimed that from that vantage point he could see two small shell casings, (DX A (shell casings)), on top of Mr. Garcia's bed "comforter." (Tr. 1 at 11-12, 46, 55-56, 68-70, 72, 75). That bed was at least eight feet away from the door as one enters from the green hallway. (*Id.* at 76). Argila testified that those shell casings were approximately an inch-and-a-half to two inches long. (*Id.* at 75). Yet, Argila still did not activate his BWC at that moment to record what he claims to have been visible from the hallway nor did he use either of the two phones he carried; his job phone or personal phone, to photograph or record what he claims to have observed from at least eight feet away on the "comforter," or make any notation of his purported observations. (Tr. 1 at 68-70).

The photo taken of Garcia's bed later (after the room was "frozen" and the Garcia women were removed to their kitchen/dining table and Argila returned to photograph it for a warrant application) depicts two small, silver shell casings on top of Garcia's geometrically patterned grey and black bed sheets, with the bed clothes stripped and the bed unmade. (DX B-7).[2] Both the shell casings and the sheets are similarly colored; the sheets are gray and black with a thick black lined geometric pattern. (*Id.*).   There is no bed "comforter" in the photo.[3]   (Tr. 1 88-89).  Argila did not activate his BWC even when he claimed to spot contraband from eight feet away inside the bedroom.  (Tr. 1 at 43-45:  The Court: "So once you saw the evidence you decided it was not necessary and you chose not to use your body camera. You had your body camera on you though, right? Argila: "Yes, I did.").  It is not until after Argila claims he spotted the tiny shell casings, other officers and then Ms. Garcia's daughter and granddaughter entered the Garcia's apartment. (Tr. 1 at 21, Gov Ex. 11 at 23:14:42; Tr. 2 at 16-17).

A bit more than three minutes after Argila first walked upstairs to Ms. Garcia's apartment, Officer Whirl's BWC video recording shows Whirl entering the Garcia's apartment. (Gov. Ex. 11 at 23:14:42). In the video, the front door to the apartment is wide open and the Garcia family members are standing against a wall around the corner to the left from the front door with several officers already inside. (Gov. Ex. 11 at 23:14:42). They appear crowded outside and inside Mr.

---

[2] Although Argila had worked for the NYPD at the time for at least 13 years, he did not disclose or provide the Government with the photos he took on his personal phone of the apartment that evening until the middle of the suppression hearing while on cross-examination, (Tr. 1 at 59, 78) when they were provided to the Government and then to the defense.

[3] In the photo (DX B-7) of the bed  there is a red screwdriver pointing at the shell casings on the bed as the photo is taken from above (not from the hallway where it is claimed Argila saw it). Argila denied placing the screwdriver there and it is unclear from the record if the screwdriver was present when Argila claims to have made his observations of the two shell casings.  He does not indicate he spotted the screwdriver at the time he purports to have seen the objects on the "comforter" from the hallway.

Garcia's bedroom. (Gov. Ex. 11 at 23:14:49). Several officers have already entered Mr. Garcia's bedroom and are searching it, (Gov. Ex. 11 at 23:15:19), including uniformed Sergeant Lynch (Tr. 1 at 107). Those officers entered the apartment and then the bedroom without a warrant nor permission and began an obvious search of the bedroom – they can be heard discussing purported contraband on the video. (*See* Tr. 1 at 54).

According to Argila, Ms. Garcia's daughter and granddaughter (who were not called by the Government as witnesses) told him that the third bedroom was their brother's room. (Tr. 1 at 12-13). Once Ms. Garcia's daughter and granddaughter returned to the apartment, the officers made all three women sit at her kitchen table until approximately 2:30 or 3:00 a.m. (Tr. 2 at 17). Around the same time, according to Argila, he "froze" the bedroom. (Tr. 1 at 14, 44-45, 47-49, 57). Shortly thereafter, Argila claims to have returned to Garcia's bedroom to take photographs to support a search warrant application. (*Id.* at 14, 24). Argila acknowledged that he did not have a warrant or consent to search the bedroom that night before he entered to take photos. (Tr. 1 at 54) The law enforcement photographs are not limited to the bedroom, however, they depict photos of the Garcia's kitchen, (DX B-6) and their living room, (DX B-5), as well as the long, green hallway leading to the bedrooms in the home (DX B-1 -B-3) and finally, the bedroom both before and after the search (DX B-7; Tr. 1 at 84 (taken after 6/29 search) DX B-10, B-11). The photograph of the mini-refrigerator inside the bedroom on top of which Argila claims to have spotted contraband, (Tr. 1 at 55-56, 86-87), depicts nothing discernible or of consequence – only clutter. (DX B-4). The closet, where Argila claims to have observed a firearm on a shelf, (Tr. 1 at 55), is on the left wall of the bedroom as one enters and is impossible to see from the hallway one walks past the bedroom door. (Tr. 1 55-56, 72 (DX B-1 – B-4)). According to Argila after he took still photos

for the warrant application, he left the apartment for the night, and returned to the 75th precinct. (*Id.* at 32, 93).

According to Puccia, after he arrested Rudy Garcia, he returned to the Garcia's apartment to secure Mr. Garcia's bedroom for the night. Both Puccia and Officer Calderon ("Calderon") stayed inside Ms. Garcia's apartment overnight. (*Id.* at 155-56; Tr. 2 at 17-18). Both male, uniformed officers who spent the night in the home with Ms. Garcia, her daughter and granddaughter that night, were armed. (Tr. 1 at 48). That night, after going to her bedroom at about 2:00 or 3:00 a.m. Ms. Garcia was unable to sleep, and at one point believed she heard officers searching her apartment. (Tr. 2 at 18).

After Argila left the Garcia's apartment, Argila made several efforts to obtain a search warrant. (*See* Tr. 1 at 92) According to Argila, someone from NYPD Field Intelligence ("FIO") told him that the officers needed a search warrant. (*Id.* at 54). Argila also claims that he spoke to an Assistant District Attorney, who told him that a warrant was not necessary. (Tr. 1 at 15 "We never even got to that. When we went to the DA they said it wasn't necessary because when I took the pictures there was other stuff in plain view.") (*see also id.* at 101 and 183)). But, instead according to a reluctant Morgan, the officers would return to try to get a "consent." (Tr. 1 at 186-88).

<u>Law Enforcement Return to the Garcia's Apartment to Obtain
After-the-Fact Consent to Search</u>

The following afternoon, June 29, 2019, after two armed, uniformed officers had spent the night inside the Garcia's apartment, law enforcement again searched the Garcia's home without a warrant or valid consent of the occupants. Before the additional officer's returned to the Garcia apartment, Ms. Garcia testified that the uniformed officers who spent the night told her daughter and granddaughter that they could not leave the apartment for work until they had a female officer

do a complete body check. (Tr. 2 at 18; DX C). Eventually, those officers allowed the daughter and granddaughter to leave the apartment, (*Id.* at 18-19), because when the additional law enforcement officer' returned, Ms. Garcia, aged 65, was again home alone. (Tr. 2 at 18, Gov. Ex. 12).

Sometime just before noon on June 29th at least six law enforcement officers returned to Ms. Garcia's apartment in addition to the two uniformed officers who had spent the night. An FIO Officer, Argila, Morgan, Whirl, Michael Garcia ("Officer Garcia"), and Sergeant Berardi ("Berardi"): all men. (Tr. 1 at 24). According to Argila, the officers went back to the Garcia apartment to recover whatever evidence they could. (*Id.* at 24). Additionally, the officers planned to get Ms. Garcia to sign a consent to search form (the "Consent Form"). (*Id.* at 95). Argila's partner Morgan albeit reluctantly, finally acknowledged that he had previously told the Government that because the Kings County District Attorney's Office would not provide a warrant, the officers went back to get a consent. (Tr. 1 at 186-88).

Because none of the officers activated their BWC initially, what exactly occurred at the Garcia's apartment on the morning of June 29, 2019, prior to when Ms. Garcia was filmed signing the Consent Form, is not recorded. Until Ms. Garcia has already been confronted with a form and with the "assistance" of law enforcement had begun to fill out the Consent Form, no recording of the events, conversation or interaction between law enforcement and Ms. Garcia before that is memorialized. According to Argila, when he returned to the Garcia's apartment on the 29th, the two uniformed officers who spent the night were still inside the apartment. (Tr. 1 at 92-93).

During the Government's case on the first day of the suppression hearing, the officers offered conflicting accounts about whether Ms. Garcia was alone when the officers returned to her home on June 29th. While the BWC footage of Ms. Garcia signing the Consent Form shows that

she was alone in the apartment (excluding the officers), several officers testified that Ms. Garcia's daughter and granddaughter were at the apartment when they returned on the 29th. According to Officer Michael Garcia, the Spanish speaking officer who "translated," when he went to the apartment, Ms. Garcia was alone (excluding the officers). (Tr. 1 at 138). Argila also testified that Ms. Garcia's daughter and granddaughter were not at the apartment when he returned on the 29th. (*Id.* at 49). However, contrary to his fellow officers and Ms. Garcia's accounts, Morgan testified that when he returned on the 29th, Ms. Garcia's daughter and granddaughter were at the apartment. (*Id.* at 173-74, 188-89). Morgan also testified that he spoke with Ms. Garcia's daughter, who translated from English to Spanish for Ms. Garcia. (*Id.* at 188-89). According to Ms. Garcia, at some point on the morning of the 29th, her daughter and granddaughter were at the apartment, but they left to go to work. (Tr. 2 at 18). Only Ms. Garcia appears in the kitchen/dining area filmed on the body-camera footage taken that day. Her daughter and granddaughter do not. (*See* Gov. Ex. 12).[4]

Prior to Ms. Garcia signing the Spanish language Consent Form, (Gov. Ex. 10) none of the officer's present in the Garcia's apartment activated their NYPD issued BWC on June 29th. (*See* Tr. 1 at 91, 135, 141). During that time, Ms. Garcia testified that the officer's threatened her. (Tr. 2 at 19-20). Specifically, the officer's told Ms. Garcia that she had to sign the Consent Form, and that if she did not the two officers who spent the night would not leave. (Tr. 2 at 20). Again, not a

---

[4] Also, in addition to conflicting accounts as to who was present, the Officers characterized the demeanor of the Garcia women who lived there in starkly different terms. While Argila indicated Ms. Garcia's daughter was "agitated and upset," (Tr. 1 at 20-21), Puccia denied observing her to be "agitated, angry or upset." (*Id.* at 158-59). Puccia also commented that the three women did not seem distressed to have the armed uniformed officers in their home overnight. *Id.* Morgan described the daughter as "angry" and claimed she wanted her brother out of the house. (*Id.* at 181-82).

single officer of the at least six to eight who were present for this encounter before the execution of the Consent Form, activated their BWC. (Tr. 1 at 24).

The first time an officer activated their BWC on June 29th was just as Ms. Garcia begins to fill out the Spanish language Consent Form with Officer Garcia's assistance. (*See* Tr. 1 at 91, 122, 141 (Gov Ex. 10)). Moreover, this was the first time Argila activated his BWC since responding to the call the night before on June 28th. (Tr. 1 at 42-43). Argila's BWC footage begins with Ms. Garcia sitting at her kitchen/dining table with Officer Garcia standing over her (Gov. Ex. 12 at 12:08:54). Ms. Garcia is wearing the same clothes as she wore the night before. In the video, Officer Garcia, who speaks Spanish, is dictating to Ms. Garcia in Spanish what to write on the Consent Form and in fact, at one point tells her how to spell the word "bedroom." (Tr. 1 117, 133; Gov. Ex. 12 at 12:09:00; Gov. Ex. 10). At no time do any of the officers inform Ms. Garcia of her right to change her mind after she signed the Consent Form, and to call off the search. (Tr. 2 at 21). Nor do they read the form aloud to her. (Tr. 1 at 138) Furthermore, none of the officers ask Ms. Garcia whether she could read at all, whether she was on any medication that could interfere with her ability to consent or whether she understood the significance of the document they were directing her how to complete. (Tr. 1 at 97-98, 138). Moreover, none of the officers, including Officer Garcia, asked Ms. Garcia to read any portion of the Consent Form. Officer Garcia testified that he did not read the Consent Form to Ms. Garcia verbatim. (Tr. 1 126, 132, 138) Moreover, Officer Garcia does not have any professional training in translating. (Tr. 1 at 131). Officer Garcia was brought to the apartment to have Ms. Garcia sign the "permission slip" to search the room. (Tr. 1 at 118). Ms. Garcia, who speaks very little English if any, (Tr. 1 at 10; Tr. 2 at 7, 9) appears hesitant at first on the video as Officer Garcia tells her where to write her name, the date, her birth date, her address on the Spanish language Consent Form, (Tr. 1 at 119-20, 126, 132-35), although

the document itself clearly indicates in Spanish where to write one's name, date of birth etc... (Gov. Ex 10).

After Ms. Garcia signs the Consent Form, Argila's BWC is finally activated in the bedroom and captures video footage and audio of him and several officers inside the bedroom documenting their search and recovery of evidence. (Tr. 1 at 62-63; Gov. Ex. 13).

Ms. Garcia, who had never testified in court before was credible and straight forward during her testimony under oath. When oriented properly to the dates and incidents at issue, her memory of the relevant events and ability to recall, articulate them, particularly considering the stress she experienced, was accurate and honest. A lay witness whose son was on trial, she did not hesitate or hedge but instead answered the Court's and counsels' questions credibly and directly as best she could recall, particularly when juxtaposed against how the professional witnesses the Government called to testify answered. The fact that some of her recollection did not square with the video of the near dozen armed officers teaming into and out of her home that night in as much as who was moving in which direction or that she failed to remember she cautioned the officers that her son was "special" the next day, hardly undermines the veracity of her account. She, unlike the other witnesses, is not a trained professional witness and she unlike the law enforcement witnesses experienced emotional trauma the night of June 28th. Argila, and the other officers, inability to communicate with her in a language she understood heightened the chaos of that night and particularly lends credence to her recounting of an impatient officer shoving past her into her home in search of a gunman that night.

The attempt to impeach her testimony with a police report written in English concerning an incident some of the details of which she denied was improper. It was not only collateral it was an attack utilizing classic extrinsic evidence prohibited by Fed. R. of Evidence 608 and should be

discounted by the Court. (Tr. 2 at 29-33). In addition, the Government's attempt to admit as evidence a "certified translation" of a transcription of a purported telephone conversation over defense objection should be denied. (Tr. 2 at 39-40). The Government failed to lay any foundation whatsoever for the call or the document; did not confront the witness with it, failed to authenticate it and regardless, the document contained irrelevant hearsay.[5] The fact that the purported written translation of an alleged phone call was a "certified translation" from Spanish to English hardly satisfies the evidentiary foundations required for its admission. The Court should disregard it.

In contrast, the professional law enforcement witnesses Argila, a thirteen-year veteran of the NYPD and Morgan (ten years), Puccia (14 years) and Officer Garcia (15 years) contradicted critical aspects of Ms. Garcia's account[6] as well as each other in material respects, including their activation of the BWC, the requirements of the NYPD Patrol Guide, who was present at the time

---

[5] *See Cauble v. Mabon Nugent & Co.,* 594 F. Supp. 985, 995 (S.D.N.Y. 1984) (holding that recorded telephone conversation is admissible in evidence at trial only if the identity of the speaker is satisfactorily established and citing *United States v. Albergo,* 539 F.2d 860, 863–64 (2d Cir.1976), *cert. denied,* 429 U.S. 1000 (1976); *United States v. McKeever,* 169 F.Supp. 426, 429–31 (S.D.N.Y.1958). "To lay a proper foundation for the admission of a transcript into evidence, the government must "produce clear and convincing evidence of authenticity and accuracy." *United States v. Hamilton,* 334 F.3d 170, 186 (2d Cir.2003) (internal quotation marks omitted); *see United States v. Anderson,* 452 F.3d 66, 77 (1st Cir.2006) (observing that "when transcripts are offered for use, either as evidence or a jury aid, they should be authenticated in the same manner as tape recordings that are offered in evidence" (internal quotation marks omitted)). Under Rule 901 of the Federal Rules of Evidence, authentication is satisfied "by evidence sufficient to support a finding that the matter in question is what its proponent claims." Fed.R.Evid. 901(a).

[6] The Government's argument that Ms. Garcia was motivated to testify falsely because she is afraid of her incarcerated son is non-sensical and absurd. Rudy Garcia is imprisoned. Ms. Garcia's testimony, if credited by this Court as it should be, would assist in her son's release. Were she truly frightened of her son, Rodolfo, Ms. Garcia would not testify to assist in the suppression of the evidence against him in an effort to have him released. The theory is illogical and a diversion to impugn the defendant who did not testify. The Government elicited no proper evidence to support the theory nor did the Defense elicit evidence concerning the mother/son relationship that would open the door to proper impeachment.

the officers returned to the apartment June 29th and their characterization of the Garcia women that evening.

On September 9, 2019, Garcia was indicted in this Court for knowingly and intentionally possessing a firearm after having previously been convicted in a court for a crime punishable for a term of imprisonment exceeding one year under 18 U.S.C. §§ 922(g)(1), 924(a)(2), and 3551 *et seq*.

ARGUMENT[7]

"The Fourth Amendment protects [t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." *Caniglia v. Strom*, 141 S. Ct. 1596, 1599 (2021) (internal citations omitted). At its core, the Fourth Amendment guarantees "the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." *Id.* "It is a basic principle of Fourth Amendment law . . . that searches and seizures inside a home without a warrant are presumptively unreasonable." *Kentucky v. King*, 563 U.S. 452, 459 (2011) (internal citations omitted). "[A]bsent exigent circumstances or consent, an entry into a private dwelling to conduct a search or effect an arrest is unreasonable without a warrant." *Steagald v. United States*, 451 U.S. 204, 214 n. 7 (1981). "[T]he protection afforded by the Fourth Amendment's warrant requirement against official entry into private homes without prior approval by a neutral magistrate was among the significant goals of our forefathers' fight for independence more than 200 years ago." *United States v. Lavan*, 10 F. Supp. 2d 377, 384 (S.D.N.Y. 1998). Thus, when relying on consent instead of a warrant, the Government must establish the reasonableness of the search. *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973).

---

[7] The hearing on the motion is limited to the suppression of physical evidence since the Government made clear it will not seek to introduce the defendant's post-arrest statement.

Under the exclusionary rule "evidence obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of the illegal search and seizure." *United States v. Calandra*, 414 U.S. 338, 347 (1974). This prohibition also applies "to the fruits of the illegally seized evidence." *Id.* The rule operates as "a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved." *Id.* at 348. The rule applies with equal effect no matter the nature of the item illegally seized by law enforcement.

Because the evidence seized from the Garcia's apartment was obtained as the result of an unconstitutional search, the evidence should be suppressed.

I.   LAW ENFORCEMENT'S WARRANTLESS ENTRY INTO THE GARCIA APARTMENT CLOSE TO MIDNIGHT ON JUNE 28th WITHOUT CONSENT AND SUBSEQUENT SEARCHES OF THE GARCIA HOME WERE UNLAWFUL AND VIOLATED THE FOURTH AMENDMENT TO THE UNITED STATES CONSTITUTION.

The warrantless searches of Rudy Garcia's apartment on June 28, and June 29, 2019, were made after an unlawful, warrantless entry by law enforcement into the apartment. "It is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant," as was the case in this matter, "are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586 (1980) (internal citations omitted).[8] The credible evidence adduced at the hearing indicates that no resident of Mr. Garcia's apartment consented to the entry and search by police officers on June 28. In addition, the request for Margot Garcia's consent on June 29 was an after-

---

[8] Mr. Garcia clearly has standing to challenge the June 28 entry and ensuing search of his home and bedroom. His standing to challenge the search and seizure is not contested. Mr. Garcia resides at 266 McKinley Avenue in the apartment where the search took place and has an expectation of privacy in his own home. (Def. Ex. C). *See United States v. Agapito*, 620 F.2d 324, 333–34 (2d Cir. 1980) ("As the lawful occupants of the room, [defendants] clearly have standing to challenge the entry.").

the-fact effort to legitimize and ratify an unlawful entry and search that had already occurred the night before. While consent may provide a basis for a warrantless search, "[w]hen a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given." *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968); *United States v. Sanchez*, 635 F.2d 47, 58 (2d Cir. 1980). The Government's burden includes "not only that the consent had been uncoerced, but that it had been given with the understanding that it could be freely and effectively with[e]ld." *Schneckloth*, 412 U.S. at 222; *see also United States v. Ramirez*, 115 F. Supp. 2d 401, 407 (S.D.N.Y. 2000) ("The government bears the burden of proof when a defendant challenges a consent to a search."). Furthermore, voluntariness is a question of fact to be determined by all circumstances, including the factor of whether the subject of a search was aware of their right to refuse. *Schneckloth*, 412 U.S. at 248-49.

It is the Government's burden to demonstrate by a preponderance of the evidence that the search and seizure did not violate the Fourth Amendment of the United States Constitution. *United States v. Strachon*, 354 F. Supp. 3d 476, 483 (S.D.N.Y. 2018) (citing U.S.C.A. Const. Amend. 4; *United States v. Murphy*, 778 F.Supp.2d 237 (N.D.N.Y. 2011), *aff'd.*, 703 F.3d 182 (2d Cir. 2012)). Here, the Government has failed to meet that burden.

A.    Law Enforcement Entered and Searched the Garcia's Apartment on June 28, 2019, Without a Warrant or Consent

On June 28, 2019, law enforcement unlawfully shoved their way into the Garcia's third-floor apartment without a warrant or the consent of any of its occupants. Ms. Garcia has consistently asserted that when Argila arrived at the front door of her apartment, he shoved her out of the way and entered the apartment without permission. (Tr. 2 at 13-14, 15; DX C). Argila's

conflicting testimony, that "[Ms. Garcia] waved [him] to come with her as she was entering the apartment" while she was home alone close to midnight, is simply not credible. (Tr. 1 at 20).

Where this Court is confronted with conflicting accounts of critical events at issue "th[is] Court, as the finder of fact, may weigh the credibility of the witnesses." *United States v. Medina*, 451 F.Supp.2d 262, 269 (D. Mass. 2006). Moreover, "[a]n adverse credibility determination is 'appropriately based upon inconsistent statements, contradictory evidence, and inherently improbable testimony.'" *United States v. Lawson*, 961 F. Supp. 2d 496, 504 (W.D.N.Y. 2013) (quoting *Diallo v. I.N.S.*, 232 F.3d 279, 287–88 (2d Cir.2000)). All of those infirmities infect Argila's account.

Here, Ms. Garcia's account of Argila's unlawful entry into her apartment is plainly more credible than that of Argila.

    1. Argila's Purposeful Failure to Activate His NYPD Issued Body-Worn-Camera <u>Demonstrates that Argila's Version of Events is Not Credible</u>

First, Argila's purposeful failure to activate and run his BWC prior to and through the critical events at issue, as mandated by the NYPD Patrol Guide, seriously undermines Argila's credibility in this matter. This Court should reject his assertion that Ms. Garcia waved him into her apartment and permitted him to walk through it essentially searching for evidence.[9]

---

[9] On April 16, 2021, the Government moved under seal to preclude inquiry on cross-examination into the officers' multiple disciplinary sanctions, civil suits and CCRB complaints over defense objection. This Court granted the motion in error. Of particular relevance is Officer Argila's and three others history of failing to properly document and memorialize arrests and encounters with civilians and arrestees in violation of the NYPD Patrol Guide and several citations for abuse of authority which implicate the Fourth Amendment of the United States Constitution. This pattern of disregard for the Patrol Guide's requirement for proper documentation is particularly probing of the conduct at question in this case given the utter failure of Argila to activate his BWC at the most crucial moments of his encounter with Ms. Garcia – the entry into her home, the purported spotting of contraband and the conversations that led to her signing a Consent Form. "[T]he substantiated misconduct including repeated failures to document, false arrests and illegal searches are all fair topics for cross-examination." *See* Defense Opposition to Motion to Preclude dated

Procedure 212-123 of the NYPD Patrol Guide **mandates** by law enforcement assigned a BWC to "[a]ctivate BWC prior to engaging in, or assisting another uniformed member of the service with the following police actions," including, *inter alia*:

MANDATORY ACTIVATION OF BWC

> Potential crime-in-progress assignments, including:
>
> - o "**10-10** (e.g., suspicious person, **shots fired, person with a gun**, person selling drugs, etc.)" § (4)(a)(1);
> - o "**10-30 series**" (robbery)[10]
> - o "Any incident involving a weapon" § (4)(a)(5); and
> - o "Shot Spotter activation" § (4)(a)(6)
> - When entering a privately owned building, "**[t]he BWC must be activated upon entering the building and will not be deactivated until exiting the building and terminating the interior patrol along with any associated police action**" § (4)(b);
> - "Public interactions that escalate and become adversarial" § (4)(c);
> - "Interactions with persons suspected of criminal activity" § (4)(e); and
> - "A search of an individual and/or his/her belongings, except for strip searches" § (4)(f)

(NYPD Patrol Guide Cite, Procedure Number 212-123, **emphasis supplied**) (*See* Def. Ex. D). Furthermore, § 10 of the NYPD Patrol Guide mandates that "[o]nce the BWC has been activated, continue recording until the investigative, enforcement, or other police action is concluded." *Id*. The failure to follow the NYPD Patrol Guide is sanctionable. (Tr. 1 at 36-37).

Those requirements obliged Argila to activate his NYPD issued BWC when he arrived at the Garcia's apartment building for several reasons. First, Argila was responding to a call for shots fired and a potential robbery. (Tr. 1 at 69-70). Therefore, NYPD Patrol Guide § (4)(a)(1)'s

---

April 26, 2021 at p. 3. This Court should revisit that ruling in light of the testimony adduced at the hearing and weigh those all of the citations disclosed in the Government's letter when evaluating the credibility of the officers' accounts. (The propriety of the request to seal and the defense opposition to it is addressed in more detail *infra*)

[10] Argila testified on cross examination that 10-30 series is a robbery and 10-10 shots fired. (Tr. 1 at 109).

requirement that officers activate their BWC when responding to a potential crime-in-progress such as 10-10 ("shots fired") or 10-30 (robbery) applied to Argila. Yet, Argila did not activate his BWC when he arrived at the apartment building. Second, under (4)(b) of the NYPD Patrol Guide, Argila was required to activate his BWC when entering a building and not deactivate it until exiting the building. Still, at no time on the night of the 28th did Argila chose to do so, including at the critical moment of his entry into the Garcia apartment, when he claims to have seen contraband or when returning with a still camera to photograph to help secure a warrant.

During the April 30, 2021 suppression hearing, Argila gave myriad excuses for why he failed to activate his BWC, none of which fall under the exceptions of the NYPD Patrol Guide's requirements for activating a BWC. Argila testified that he chose not to turn on his BWC on the night of the 28th "because there were other officers already on the scene," that he "thought [he] was talking to a potential witness," and that he "didn't think that there was going to be any adversarial encounter" (*Id.* at 39-42). Nowhere in the NYPD Patrol Guide does it state that officers may elect not to activate their BWC simply because another officer has activated theirs. In fact, the NYPD Guide requires officers to "[a]ctivate BWC prior to engaging in, **or assisting another uniformed member** of the service" when taking certain police actions such as responding to shots fired. (NYPD Patrol Guide, DX D (emphasis added)). Moreover, the fact that Argila was responding to robbery and/or shots fired alone mandates that he activate his BWC. Further, the fact that his fellow officer Whirl recorded attempted entry into the first-floor apartment and the entire encounter with the family on the second floor suggests that Argila's excuses were after the contrived justifications. While in response to the Court's question, Argila claimed that because his encounter was with a potential witness he did not activate his body camera when he engaged with Ms. Garcia, (Tr. 1 at 38-40), in contrast the entire encounter with the family on the second

floor was recorded even though Argila himself stated he did not believe they "had anything to do with it." (Tr. 1 at 19; Gov. Ex. 11 at 23:11:03).

Argila has nearly 13 years of law enforcement experience with the NYPD, testified that he was wearing his BWC on the night of the 28th, and stated that he was aware of the NYPD Patrol Guide's requirements for activating his BWC. (*See* Tr. 1 at 34, 36-40). Therefore, Argila's excuses for not activating his BWC as required by the NYPD Patrol Guide are unconvincing and should not be countenanced or credited by this or any Court. Where an officer's testimony is "inherently improper" and contradicted by another witness's testimony, this Court should find that Ms. Garcia did not consent to Argila entering or searching her apartment. *See Lawson*, 961 F. Supp. 2d at 499 (upholding Magistrate Court's findings that an officers' testimony was "inherently improbable" and crediting "defendant's testimony that he never consented to a search of his apartment.").

Accordingly, in weighing Ms. Garcia's testimony that Argila shoved her and entered her apartment without her permission against Argila's testimony that Ms. Garcia waved him in, this Court should find that Argila's failure to activate his BWC at that critical moment alone demonstrates his lack of credibility.

2. Argila's Purposeful Failure to Activate His BWC Warrants an Adverse Inference Against the Credibility of His Account

Given Argila's blatant disregard for the NYPD Patrol Guide's requirements on the use of BWC's, particularly when entering a civilian's home without a warrant, this Court should adopt an adverse inference. While it is true that body-worn-cameras are relatively new type of evidence and that credibility of witness accounts have been measured for years absent body cameras, recent case law suggest that this Court should make an adverse inference on Argila's failure to activate his BWC. Finding an adverse inference for the purposeful failure to activate the camera will advance the public policy behind the issuance of the equipment, reinforce the accountability they

are meant to restore and importantly, bolster public confidence in the administration of the law on the street and in the courts.

For example, in *United States v. Tillard*, No. 18-CR-6091-FPG-JWF, 2019 WL 8105894, at *3, *6 (W.D.N.Y. Oct. 4, 2019), *adopting report and recommendation*, No. 18-CR-6091-FPG, 2020 WL 57198, (W.D.N.Y. Jan. 6, 2020), the court addressed whether to adopt an adverse inference to the credibility of a testifying law enforcement officer who had their BWC off during a traffic stop. While the *Tillard* court declined to reject the officers' testimony or adopt an adverse inference to their credibility for failing to activate their BWC, the court did so for reasons entirely absent from this case.

First, the *Tillard* court reasoned that "both officers explained their reasons for failing to activate their cameras and offered consistent testimony and Defendant did not present contradictory testimony." *United States v. Tillard*, No. 18-CR-6091-FPG, 2020 WL 57198, at *6 (W.D.N.Y. Jan. 6, 2020). Here, Ms. Garcia provided credible and directly contradictory testimony challenging Argila's account of the night of June 28, 2019. (DX C (affidavit of Margot Garcia)). Furthermore, the *Tillard* court was persuaded by the fact that the officers "plausibly explained their failure to turn on their body-worn cameras." *Id.* Here, however, Argila failed to plausibly explain his failure to turn on his BWC. Argila conveniently turned on his camera just as Ms. Garcia signed the Consent Form, more than 12 hours after he first entered the Garcia's apartment.

Argila has offered no plausible explanation for why he failed to activate his BWC when arriving at scene as mandated by the NYPD Patrol Guide, when he entered the apartment building, when he entered the Garcia apartment, when he supposedly spotted a one and a half to two inch shell casing on patterned sheets from standing outside Garcia's bedroom eight feet away, or at any time prior to him leaving the apartment building on the evening of the 28th of June. Unlike the

officers in *Tillar*d, Argila was hardly in hot pursuit of a sprinting suspect nor is there any suggestion the BWC was new or unfamiliar to the 13-year veteran Argila. The NYPD Patrol Guide required Argila to activate his BWC in each of those moments, and Argila's explanation for his failure rings hallow especially when compared to that of the officer in *Tillard*.[11]

Moreover, while courts in the Second Circuit have declined to suppress evidence only because an officer deactivated their BWC, many courts have noted that it would impact the credibility of the officer's testimony, which is the crux of this matter. For example, in *Tillard* while referencing *United States v. Griffin*, No. 18-CR-100-PP, 2018 WL 4929397, at *4 (E.D. Wis. Oct. 11, 2018), the court noted that "there may be situations where the lack of [body camera] recording might tip the balance in favor of a defendant's version of events in a close case." *Tillard*, 2019 WL 8105894, at *6 (internal citations omitted). This case presents the exact scenario envisioned by the *Griffin* court. At issue is whether Argila shoved past Ms. Garcia and forced his way into the Garcia apartment as part of an anti-crime unit searching for the source of the "shots fired" complaint. Argila and Ms. Garcia have offered conflicting accounts that would have been resolved had Argila activated his BWC, as mandated by the NYPD Patrol Guide.

Similarly in *Walls v. City of New York*, 502 F. Supp. 3d 686, 694 (E.D.N.Y. 2020), the court noted "that police misconduct complaints…are relevant to assessing an [ ] Officer's credibility and possible willingness to violate constitutional or departmental norms . . . the Court agrees with Plaintiffs that a non-exhaustive list of relevant misconduct includes . . . complaints that Defendant Officers intentionally or unreasonably turned off required body cameras during

---

[11] In *Tillard*, the defendant moved to suppress statements he made and physical evidence seized during a traffic stop. *Tillard*, 2020 WL 57198, at *1. There the court considered the fact that BWC was at that time new to the officers, and that in fact the officer thought his BWC was activated. *Id.* Furthermore, the court found it understandable that while "pursuing a suspect fleeing at a full sprint the[ ] officers would fail to turn on their body-worn camera" *Id.* (internal citations omitted).

police operations that required them is relevant to Plaintiffs' allegations that Defendant Officers fabricated evidence against them affirmatively or by omission here."

In *People v. Yarborough*, 64 Misc.3d 1209(A), 2019 WL 2896694 (N.Y. Sup. Ct. July 2, 2019)[12], the court noted that the officer violated departmental procedure by not having his body camera on until after apprehending the defendant. In addition, for various reasons, the court concluded that "the People have failed to meet their burden of establishing the lawfulness of the police conduct. Accordingly, the defendant's motion to suppress evidence...must be granted." *Id.* at *8.

Additionally, public policy supports an adverse inference if not suppression of the evidence in this case. The legislative history of New York's BWC legislation N.Y. EXEC. LAW § 234 (McKinney 2021), emphasizes the importance of keeping cameras on during critical moments. The law stated that "[t]he purpose of the program is to increase accountability and evidence for law enforcement and the residents of the state by providing body-worn cameras to all state police officers while on patrol." § 234 (1).

The New York Committee Report, NY S.B. 8493 (Relates to the use of body-worn cameras by New York state police officers) (June 19, 2020), discussed that "[t]here have been numerous cases, where the lack of video or audio recordings in alleged cases of excessive force by law enforcement have led to a trust deficit between communities and the police." *Id.* In addition, the report noted that "[t]here are many studies, which have been conducted, that show a direct co-relation between the usage of body-worn cameras and a drop in use of force incidents, and citizen's complaints against police officers....This bill will mandate the New York State Police's Troopers to use body- worn cameras while on patrol to promote accountability, and keep video records of

---

[12] Attached as DX E.

all interactions that Troopers have with individuals who are stopped on suspicion of a crime, or a traffic violation." *Id.*

Furthermore, while an officer's purposeful failure to activate a BWC may be a relatively new issue for courts to address, the concept is not unprecedented. The issue is analogous to the selective use of video evidence form other camera sources. Courts in the Second Circuit have granted motions to suppress video evidence when the evidence was clearly cherry-picked to distort the incident at question. For example, in *U.S. v. Yevakpor*, 419 F.Supp.2d 242, 252 (N.D.N.Y. 2006), the court granted the motion to suppress three one-minute video segments noting "the Government cannot make use of video segments that have been 'cherry-picked' when the remainder of the recording has been erased or recorded-over subsequent to defendant's arrest." The court explained that "[t]he Supervisory Officer did not direct that the entire video recording be preserved - a relatively easy and inexpensive task considering that the video can be saved to compact disc, by the Government's own admission." *Id.* at 246-47. The erasure or failure to preserve recordings is tantamount to the purposeful failure to record or activate the BWC and when law enforcement selectively activates their BWC during police actions.

Even setting aside the failure to activate the BWC when mandated by the NYPD Patrol Guide to do so, Officer Argila acknowledged that he was carrying two separate phones equipped with cameras at the time of this encounter. (Tr. 1 at 51). His failure to document his purported view of the contraband on the bed that launched his investigation is equally implausible. Mid-hearing the veteran officer Argila acknowledged his failure to provide the photos in his phone to the Government and hence the defense, and the photos taken up-close and above the shell casings are clearly not from the hallway where he claims to have first seen them. Likewise, the photo of

alleged contraband on the mini-fridge, if it existed at all, is not visible in the photo supposedly taken to document it to support a warrant application. (DX B-4).

Given Argila's failure to activate his BWC at any point prior to entering the Garcia's apartment as required by the NYPD Patrol Guide, or at any point prior to Ms. Garcia signing the Consent Form the following day, this Court should credit Ms. Garcia's testimony over Argila's, and conclude that he entered the Garcia's apartment on the night of June 28th, 2019 without permission and obviously without valid consent.

B.    The Plain View Exception to the Warrant Requirement Does Not Apply

Whether the Kings County District Attorney declined to issue a warrant and directed law enforcement to get written proof of consent as Officer Morgan reluctantly eventually acknowledged, (Tr. 1 at 107), or whether that ADA believed the items were in fact observed in "plain view," that exception to the warrant requirement does not salvage the unlawful search in this case.   In order to have made any plain view observation of the tiny contraband Argila claims to have made on the bed from the hallway Argila must have been lawfully in a place to view it in the first place, to have viewed its incriminating character and have had lawful access to it.

"It is, of course, an essential predicate to any valid warrantless seizure of incriminating evidence that the officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed." *Horton v. California*, 496 U.S. 128, 136 (1990); *King,* 563 U.S. at  462–63 (2011) ("... we have held that law enforcement officers may seize evidence in plain view, **provided that they have not violated the Fourth Amendment in arriving at the spot from which the observation of the evidence is made**. (citing *Horton*, 496 U.S. at 136–140 (1990) (emphasis supplied)); *see also Ishay v. City of New York*, No. 96-CV-5829 FB, 2000 WL 1140437, at *3, 8 (E.D.N.Y. Aug. 8, 2000) (denying summary judgment due to genuine issue of material

fact and noting that "under certain circumstances the police may seize certain evidence without a warrant." (internal citations omitted)). As discussed, given both the inherent incredibility of Argila's account and that it is squarely contradicted by Ms. Garcia's sworn testimony and especially in the absence of the NYPD Patrol Guide's mandated BWC recording, the Government has failed to meet its burden of proof that Argila was lawfully in a position to make any plain view observation or have a lawful right of access to the objects in the bedroom itself.

"There are, moreover, two additional conditions that must be satisfied to justify the warrantless seizure. First, not only must the item be in plain view; its incriminating character must also be 'immediately apparent.'" *Horton*, 496 U.S., at 136. (internal citations omitted); *see also Arizona v. Hicks*, 480 U.S. 321 at 326–327. Second, not only must the officer be lawfully located in a place from which the object can be plainly seen, but he or she <u>must also have a lawful right of access to the object itself</u>. As the United States has suggested, Justice Harlan's vote in Coolidge may have rested on the fact that the seizure of the cars was accomplished by means of a warrantless trespass on the defendant's property. In all events, we are satisfied that the absence of inadvertence was not essential to the Court's rejection of the State's 'plain-view' argument in Coolidge." *Horton*, 496 U.S. at 136–37; *see also, United States v. Lee*, 660 F. App'x 8, 14 (2d Cir. 2016) ("Under the plain view exception, once law enforcement officers 'are lawfully in a position from which they view an object' to which they 'have a lawful right of access,' and its 'incriminating character is immediately apparent,' the officers 'may seize it without a warrant.'" *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993)).

Even assuming that Argila was lawfully in a position to view the camouflaged, two inches long shell casings on the grey, patterned sheets from the hallway, his return to the inside of the bedroom later to photograph and look around further for what he claims to have seen from inside

in plain view violated the Constitution. U.S. Const. IV.  By the time Argila returned from removing the Garcia women to the dining/kitchen area to photograph items in the bedroom, clearly a search of it had been conducted. The Whirl BWC recording shows uniformed officers Sergeant Lynch (Tr. 1, at 107; GX 11 23:15:00) among others already inside the bedroom searching it as the Garcia women stood in the hall. Even assuming the shell casings were visible in plain view, the entry of law enforcement into the bedroom to search the closet and the top of the mini-fridge itself was not, nor was the entry by Argila later to photograph any of it to support of a search warrant.[13] Accordingly, none of the law enforcement officers were lawfully in a position to have made the observations he claims, nor did he have "lawful rightful access" to what he claimed was contraband in the bedroom, thereafter.  *Dickerson*, 508 U.S. at 375 (1993). Accordingly, all of the physical evidence seized in this case should be suppressed.

      C.     The Government Has Failed to Meet Their Burden of Demonstrating that Ms. Garcia Signed the Consent Form on June 29th Knowingly, Freely and Voluntarily

The Government has also failed to meet their burden of demonstrating that Ms. Garcia gave valid consent on June 29, 2019 for law enforcement to search and photograph her home.

---

[13]  Clearly the inevitable discovery doctrine could not apply to these facts.  Given Argila and Morgan's testimony that the Kings County District Attorneys office either declined to issue a warrant, found one unnecessary or directed the officers to try to secure "a consent" instead surely no search warrant would be forthcoming for the apartment and hence the discovery was hardly inevitable. Argila claims that he spoke to an Assistant District Attorney, who told him that a warrant was not necessary. (Tr. 1 at 15 "We never even got to that. When we went to the DA they said it wasn't necessary because when I took the pictures there was other stuff in plain view.") (*see also* Tr 1. at 101 and 183)). The officers planned to get Ms. Garcia to sign a consent to search form (the "Consent Form"). (Tr. 1 at 95).  Argila's partner Morgan albeit reluctantly, finally acknowledged that he had previously told the Government that because the Kings County District Attorney's Office would not provide a warrant, the officers went back to get "a consent." (Tr. 1 186-88). *See, United States v. Arms*, No. 01-CR-286(FB), 2002 WL 32781, at *5 (E.D.N.Y. Jan. 14, 2002 Block, DJ) (applying inevitable discovery exception where "for all intents and purposes, the status of the warrant application was not merely that it was well in progress, but that it was essentially completed.").

As discussed *supra*, "[w]hen a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given." *Bumper*, 391 U.S. at 548. When considering whether consent is valid, "[r]elevant considerations include, but are not limited to, the age of the subject, his level of education and of intelligence, and whether he was deprived of food or sleep or subjected to other physical abuse." *Sanchez*, 635 F.2d at 58. The Government's "burden cannot be discharged by showing no more than acquiescence to a claim of lawful authority" *Bumper*, 391 U.S. at 548-49, but must demonstrate that the consent was "a product of [her] free and unconstrained choice." *United States v. Wilson*, 11 F.3d 346, 351 (2d Cir. 1993).

Ms. Garcia suffered almost all of these vulnerabilities to objectively coercive tactics and more when she signed the Consent Form after two armed, uniformed, male, law enforcement officers occupied her apartment through the night for at least 12 hours. Given the coercive power of having law enforcement occupy her home while she, her daughter and granddaughter were present for over 12 hours the government cannot overcome the involuntariness of her eventual acquiescence to law enforcement demonstrate that Ms. Garcia's signing of the Consent Form was made voluntarily.

To be sure, close to midnight on June 28th a team of uniformed and plain clothed armed policemen entered the apartment, searched it and questioned the three female occupants. Ms. Garcia, who was 65 years of age and speaks very little if any English was amongst these armed men – none of whom spoke her language Spanish - in the sanctity of her own home. She was required to answer questions after being removed from the hall to the kitchen/dining area and had to ask permission of law enforcement to use her own bathroom. (Tr. 2 at 17). Two of these armed uniformed men remained overnight in the Garcia apartment for more than twelve hours, (*Id.* at

20), until close to noon when 5 – 6 additional male officers returned the next day. (Tr. 1 at 25). Ms. Garcia, who is wearing the same clothes from the night before, hardly slept if at all, (Tr. 2 at 18), is obviously distraught, nervous and scared throughout the more than 12-hour ordeal, (*Id.* at 15, 20), is not asked to memorialize her purported consent until the next day, after her daughter and granddaughter have left her alone with the police having first been denied permission to leave. (Gov. Ex. 12 at 12:09:00; DX C; Tr. 2 at 18).[14]

While Ms. Garcia's consent could have potentially justified the second search on June 29, 2021, Ms. Garcia did not consent to the search of the apartment on the 28th, nor did she understand her right to refuse to sign a consent form, but instead understandably, felt threatened by this incredible, intimidating totality of circumstances. (Tr. 2 at 20; DX C). *United States v. Isiofia*, 370 F.3d 226, 231 (2d Cir. 2004) (in evaluating the voluntariness of consent the Court must examine the totality of the circumstances, upholding District Court decision to find consent invalid notwithstanding signed written consent); *see also Schneckloth*, 412 U.S. at 228-29 (consent may not be coerced, even subtly, or the resulting consent "would be no more than a pretext for the unjustified police intrusion against which the Fourth Amendment is directed"); *accord Georgia v. Randolph*, 547 U.S. 103, 106 (2006) (even a co-occupant cannot consent to a search over the express refusal of other present co-occupants). Under this totality of the circumstances, from any objective standard it is apparent that this woman did not and could not voluntarily consent to the search of her home.

1. Any Consent is Invalid Because of Law Enforcement Unlawfully Searched Ms. Garcia's Apartment the Night Before

---

[14] The fact that Ms. Garcia does not appear hostile on video to the authority occupying her home that night does not evidence a lack of intimidation or fear. Attempts to placate the team of officers with coffee or subservience hardly undermines her credible and understandable sense of vulnerability, nervousness and misapprehension of her rights.

Even assuming *arguendo* that Ms. Garcia did voluntarily consent, any consent was obviously belated after a search had already occurred the night before. The government may not cure a warrantless search by obtaining a post-hoc consent to search. *See United States v. Bushay*, 859 F. Supp. 2d 1335, 1369 (N.D. Ga. 2012) (holding that an "after-the-fact-written consent is akin to a mere submission to official authority," absent facts supporting a finding that the written consent was a voluntary ratification of a prior verbal consent); *see also United States v. Barone*, 721 F. Supp. 2d 261, 278 (S.D.N.Y. 2010) ("the arrest team's illegal entry and protective sweep invalidates [defendant's] consent unless the taint of the initial entry had been dissipated before the 'consents' to search were given.") (internal citations omitted).

## 2. Ms. Garcia's Signed Consent Was Involuntary and Uninformed

When Ms. Garcia placed her signature on the Consent Form the day after her son's arrest on the video, she plainly appears to have been vulnerable and subject to coercive pressures that invalidated the consent. Her affidavit and testimony bear that out. *See United States v. Medico*, 557 F.2d 309, 312 (2d Cir. 1977) ("In determining whether acquiescence was voluntary, account must be taken of . . . the possibly vulnerable subjective state of the person who consents") (internal quotation marks and citations omitted). Besides feeling "very scared" and "nervous" (Tr. 2 at 15, 20) and alone (*Id.* at 18) when the police returned en masse to secure her signature on the form, (Tr. 1 at 24). Ms. Garcia testified that she was told the police would not leave unless she signed the consent form. (Tr. 2 at 20–21).

This consent to search was anything but "a product of [her] free and unconstrained choice." *Wilson*, 11 F.3d at 351. Rather, it was at most an "acquiescence in a show of authority," obtained using explicit and implicit coercive tactics. *United States v. Munoz*, 987 F. Supp. 2d 438, 444 (S.D.N.Y. 2013) (internal quotation marks omitted).

Ms. Garcia was born and educated only until the fourth grade in her home country of Colombia. (Tr. 2 at 8). She speaks "very, very little English," (Tr. 1 at 10; Tr. 2 at 7), and was taking anxiety medications at the time of police entered her home on both days. (Tr. 2 at 9). She testified that she has not worked outside the home in thirty years since her now adult son Rudy was five years old and that she receives Social Security Disability to support herself, as does her son. (Tr. 2 at 9-10). As the Court observed, Ms. Garcia appears hesitant on the video (Tr. 1 at 119; Gov. Ex. 12) as she is essentially dictated to by Officer Garcia on video where to write what and where to sign. (Tr. 2 at 20). At no time does she appear to read the form independently, she is not asked if she can read Spanish and she is not even told by the Officer who stands over her verbatim what the form says. Instead, Ms. Garcia is directed how to complete the most rudimentary and self-explanatory portions of the form including what line to write her name, what line to place her date of birth, where to sign and even how to spell the word "bedroom." (Tr. 1 at 133; Gov. Ex. 12). Worse, Ms. Garcia testified that the police officers threatened her prior to signing the Consent Form indicating that they would not leave unless she did. (Tr. 2 at 20). And, she also testified that at first the officers did not permit her daughter and granddaughter to leave for work eventually they did, leaving Ms. Garcia home alone with law enforcement. (*Id.* at 18).

In short, by the time Ms. Garcia signed the Consent Form, armed, male NYPD officers had already been entering and exiting her apartment at will for over twelve hours through the night, photographing the apartment and creating a coercive environment in which she was asked to ratify conduct that had already occurred. *See Sanchez,* 635 F.2d at 58-59. Additionally, on June 29, with officers already inside her apartment, Ms. Garcia was not offered the option of refusing to consent to their entry and search nor was she aware of that right. (Tr. 2 at 21). Under such circumstances, courts have found consent involuntary. *See, e.g.*, *United States v. Long Huang You*, 198 F. Supp.

2d 393, 405 (S.D.N.Y. 2002) (Where defendant "gave his permission to conduct a search, he was facing six agents who were either standing inside his apartment or outside in the hallway. Under such conditions, the officers lacked any reasonable basis to believe that [defendant's] consent was not the product of implied duress or coercion. [Defendant's] consent to the search was anything but the product of an essentially free and unconstrained choice.") (internal citations omitted).

All these factors objectively and subjectively indicate that at best, her will was overborn. *See, e.g.*, *United States v. Patzer*, 277 F.3d 1080, 1084-85 (9th Cir. 2002) (an unlawful arrest tainted a defendant's consent to search, making it invalid); *see also United States v. Guzman*, 724 F. Supp. 2d 434, 443 (S.D.N.Y. 2010) (officer's threat to arrest everyone present made consent to search invalid). While "objective reasonableness" is the standard, the Court must still take into account "the possibly vulnerable subjective state of the person who consents." *Munoz*, 987 F. Supp. 2d at 444 (internal quotation marks omitted). Thus, the existence of a consent form does not automatically render the search voluntary if other coercive factors are present. *See, e.g.*, *Isiofia*, 370 F.3d at 233-34 (affirming district court finding that consent was involuntary despite existence of consent to search form).

Accordingly, all evidence seized as a result of the unlawful seizure and search and the fruits thereof should be suppressed.

II.     The Governments Request to Seal the Pre-Hearing Motion Concerning *Giglio* and Related to Law Enforcement Conduct Including But Not Limited to Internal Departmental Discipline, CCRB Complaints and Civil Suits Should be Denied

On April 16, 2021, the Government moved to preclude Defendant from cross-examining Argila, Officer Garcia, Morgan, and Puccia about a series of civil lawsuits, NYPD and/or CCRB investigations even into their corroborated conduct. The motion was granted over defense

objection. Again, over defense objection the Government moved to seal the contents of the *Giglio*

(potential *Brady*) disclosure. For the following reasons, this Court should deny that request.

"Under the common law right of public access, the public has a 'general right to inspect

and copy public records and documents, including judicial records and documents.'" *United States*

*v. Basciano*, No. 03-CR-929, 2010 WL 1685810, at *2 (E.D.N.Y. Apr. 23, 2010) (quoting *Nixon*

*v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597 (1978)). "Such documents may be sealed, however,

when there are countervailing factors such as privacy interests at stake, and where 'specific, on the

record findings are made demonstrating that closure is essential to preserve higher values and is

narrowly tailored to serve that interest.'" *McCord v. Reardon*, No. 20-CV-2005 (EK), 2020 WL

5342637, at *2 (E.D.N.Y. Sept. 4, 2020) (quoting *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d

110, 121 (2d Cir. 2006)). "The party moving to seal documents bears the burden of demonstrating

that sealing is warranted." *United States v. Key*, No. 98-CR-446 ERK, 2010 WL 3724358, at *2

(E.D.N.Y. Sept. 15, 2010) (internal citations omitted). Here, the Government has failed to

demonstrate that sealing its April 16, 2021 motion or the defense opposition to it is warranted.

The motion includes substantiated misconduct complaints against the officers, including

repeated failures to properly document encounters, false arrests, and illegal searches. The public

has the right to access that information. "Transparency in officer misconduct records is critical for

all actors in the criminal justice system, but few people are more directly impacted by issues of

officer credibility than those who are prosecuted for crimes based on officer observations,

statements, and testimony." Brief for The New York Civil Liberties Union as Amici Curiae

Supporting Respondents, *Walls v. City of New York*, 502 F. Supp. 3d 686, 696 (E.D.N.Y. 2020)

(Dkt. No. 109). Unlike a traditional witness, officers are public officials "invested with great public

trust, and that trust comes with the expectation that the officer will carry out her duties according

to the law and to police department rules." Jonathan Abel, *Brady's Blind Spot: Impeachment Evidence in Police Personnel Files and the Battle Splitting the Prosecution Team*, 67 STAN. L. REV. 743, 789 (2015). "An officer disciplined for breaking these rules has no right to demand that this discipline remain private." *Id.* Furthermore, "police officers, as serial witnesses, may testify in hundreds of cases." *Id.* If their personal records, including allegations of misconduct, are revealed in one case, the disclosure could benefit defendants in other cases. *Id.*

Finally, after long awaited reform in this formerly closely shielded arena, the public now has the right to access the underlying contents of the Government's letter. On June 12, 2020, New York State repealed New York Civil Rights Law § 50-a ("§ 50-a") as part of a set of reforms to enhance government transparency and police accountability. Prior to its repeal, § 50-a shielded "from public disclosure personnel records of various uniformed officers including police officers." *Uniformed Fire Officers Ass'n v. de Blasio*, 973 F.3d 41, 45 (2d Cir. 2020). Permitting the Government to file this motion under seal flies in the face of that reform, is counter to public policy and would impede the State's goal of increasing transparency into police accountability.

Accordingly, the Governments request to seal the April 16, 2021 letter should be denied.

CONCLUSION

Plain clothed and uniformed law enforcement entered the Garcia apartment close to midnight, searched and eventually collected evidence including guns, shell casings and other material from what is the most private of area in any home, the bedroom. They did so without a warrant, without valid consent and without any applicable, or plausible exception to the Fourth Amendment requirements. Any purported consent was given after the entry, after the search and after two uniformed and armed men spent the night in the Garcia women's home was not freely nor voluntarily given. Accordingly, Rodolfo Garcia respectfully requests that this Court suppress

the fruits of the search of his apartment including his bedroom and for whatever additional relief this Court deems just and fair. *See, Wong Sun v. United States*, 371 U.S. 471, 484 (1963) (reiterating "that evidence seized during an unlawful search could not constitute proof against the victim of the search.").

Dated: New York, New York
      July 8, 2021

VLADECK RASKIN & CLARK, P.C.

By: /s/  *Susan J. Walsh*
    Susan J. Walsh
    Brandon White (on the brief)
    Attorneys for Rodolfo Garcia
    565 Fifth Ave., 9th Floor
    New York, New York 10017
    (212) 403-7300
    (646) 398-1514