TH:JRS/GN
F. #2019R01170

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

– – – – – – – – – – – – – – – – –X

UNITED STATES OF AMERICA

    - against -                                        Docket No. 19-CR-410 (FB)

RODOLFO GARCIA,

             Defendant.

– – – – – – – – – – – – – – – – –X

## THE GOVERNMENT'S POST-HEARING MEMORANDUM IN OPPOSITION TO THE DEFENDANT'S MOTION TO SUPPRESS EVIDENCE

JACQUELYN M. KASULIS
ACTING UNITED STATES ATTORNEY
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

Jonathan Siegel
Genny Ngai
Assistant U.S. Attorneys
    (Of Counsel)

# TABLE OF CONTENTS

PRELIMINARY STATEMENT .......................................................................................... 1

FACTUAL BACKGROUND............................................................................................. 2

ARGUMENT................................................................................................................... 6

   I.  The Hearing Testimony Establishes Ms. Garcia's Consent Was Voluntary ............... 7

  II.  The Initial Entry into the Apartment Was Lawful ..................................................... 10

     A.  Detective Argila's Testimony .............................................................................. 10

     B.  Ms. Garcia's Testimony Was Not Credible .......................................................... 14

 III. Even Under the Defendant's Facts, the Search was Lawful ....................................... 16

 IV. The Government's Letter Discussing Officers' Disciplinary Records Was Properly
     Filed Under Seal......................................................................................................... 18

CONCLUSION.................................................................................................................. 19

<u>PRELIMINARY STATEMENT</u>

The government respectfully submits this post-hearing memorandum in opposition to the defendant's motion to suppress. ECF Dkt. No. 28 ("Mot."). As the government detailed in its opposition brief (ECF Dkt No. 34 ("Opp'n")), and as the government proved at the evidentiary hearing held on April 30, 2021 and May 19, 2021, the challenged June 29, 2019 search was voluntarily consented to by the defendant's mother, who signed a Spanish-language consent-to-search form authorizing the search.

The defendant's mother's testimony that officers initially shoved their way into her apartment on June 28, 2019 should be rejected. Indeed, the defendant's mother made no such allegation in her original affidavit, and the defendant never claimed that any officers had assaulted his mother in his original motion. That inconsistency, as well as the numerous instances of the defendant's mother testimony contradicting video evidence and common sense, demonstrate that the defendant's mother's testimony cannot be credited.

But even if the defendant's mother's testimony were accepted (and it should not be), the search was lawful. An illegal initial entry does not undermine a subsequent consent to search if the taint from that entry has dissipated. Here, given the 12-hour gap between the entry and the consent, as well as the provision of a consent-to-search form advising the defendant's mother of her rights, any taint would have dissipated, and the consent is controlling.

The defendant's motion should therefore be denied.[1]

---

[1] For the reasons set forth in the government's opposition brief, the defendant's other claims seeking to suppress his post-arrest statement and for certain pre-trial discovery should also be denied. <u>See</u> Opp'n 13-17.

<u>FACTUAL BACKGROUND</u>

At the evidentiary hearing on April 30, 2021 and May 19, 2021, the government established the following facts:

On June 28, 2019, Detective (then-Officer) James Argila, Officer Kevin Morgan, Officer Justin Puccia and others responded to a radio run for a shots-fired incident at 266 McKinley Avenue, Brooklyn, New York.  <u>See</u> April 30, 2021 Tr. ("Apr. Tr.") 6:25-7:10, 145:8-22, 163:19-164:9.  Witnesses on scene stated that the perpetrator of the shooting lived in the building, and officers determined that he likely lived on the first or second floor. <u>See</u> Apr. Tr. 7:21-25, 146:20-148:8, 164:10-25; GX 20 at 23:07:30-23:07:45, 23:08:00-23:08:20 (Officer Puccia's body-worn camera footage showing him speaking to witnesses and relaying the information to other officers).[2]

Detective Argila, Officer Morgan, and their partner Detective (then-Officer) Whirl entered the building to investigate.  <u>See</u> Apr. Tr. 8:1-3, 165:1-2.  They knocked on the door of the first floor apartment, but no one answered.  <u>Id.</u> at 8:6-8; <u>see</u> GX 11 at 23:08:20-23:09:55 (Detective Whirl's body-worn camera footage showing the officers on the first floor).  The officers then proceeded to the second floor, where they knocked on the apartment door and spoke to the residents inside.  <u>See</u> Apr. Tr. 8:11-1, 165:3-11; GX 11 at 23:09:55-23:14:30 (Detective Whirl's body-worn camera footage showing the officers on the second floor).

While the officers were on the second floor, a woman (later identified as Margot Garcia, the defendant's mother) leaned over the bannister and tried to speak to the

---

[2]     All citations to video use the timestamps printed in the upper-left corners of the videos.

officers, although the officers could not hear what she was saying.  See Apr. Tr. 9:2-12, 165:12-21; GX 11 at 23:11:25-23:11:30 (body-worn camera footage showing Detective Argila looking up at Ms. Garcia on the third floor and saying, "Huh?").  In response, Detective Argila walked up to the third floor to speak with her to see if she had any information about the shooting.  See Apr. Tr. 9:16-24, 165:15-166:1.  Detective Argila was alone with Ms. Garcia for approximately three minutes.  See GX 11 at 23:11:27-23:11:35 (video showing Detective Argila walking to the third floor), 23:14:17-23:14:25 (video showing the defendant's sister and niece walking to the third floor).

While they were upstairs, Ms. Garcia waved Detective Argila into her apartment.  See Apr. Tr. 9:25-10:4.  Ms. Garcia showed Detective Argila the inside of the apartment, including a locked closet in the back bedroom, and offered to open it.  See id. at 11:6-12.  Detective Argila declined, believing that it would not be relevant to his investigation.  See id. at 11:11-12.  As he explained at the hearing, "We didn't go to search her apartment and we didn't think she really had anything to do with it.  I went upstairs to see if she had any information as to what was going on.  At this point I thought that whoever was responsible was on the first or second floor."  Id. at 11:15-19.

Detective Argila turned to leave, but on his way out, he passed the open door to a bedroom.  See id. at 11:22-12:4.  Through the open door, Detective Argila saw shell casings sitting on the bed.  See id.  When Detective Argila asked whose bedroom it was, Ms. Garcia answered that it was her son's.  See id. at 12:3-6.  At this point, two women — the defendant's sister and niece — came upstairs.  See id. at 12:16-20.  These women, who spoke English, explained that the bedroom was the defendant's.  See id. at 12:21-13:2.

At approximately the same time the defendant's sister and niece returned home, other officers joined Detective Argila upstairs.  See GX 11 at 23:14:43-23:15:15 (video showing other officers arriving upstairs).  Although no officers searched the bedroom that night, officers "froze" the bedroom, meaning they ensured no one was inside the bedroom and then prevented anyone from going in to potentially tamper with evidence.  See Apr. Tr. 14:6-12, 15:8-10, 47:15-19,  71:14-23, 107:25-108:7, 172:22-24; see also GX 11 at 23:15:15-23:17:00 (video of Detective Whirl looking around the defendant's bedroom with a flashlight, being told that the family should be kept out of the room, and leaving without taking any evidence).  Also at approximately the same time, the defendant — who was outside the building — was identified by other officers as the person who had fired the shots and was arrested.  See Apr. Tr. 149:15-24.

While the officers were in the apartment, all of the family members were "calm" and "cooperative," and they did not appear to be frightened or threatened.  Id. at 21:19-21, 151:8-21, 153:8-14, 158:17-159:15, 172:7-19, 173:6-9.[3]  At no point did anyone ask any of the officers to leave or suggest that they wanted the officers to leave.  See id. at 23:20-25.  The defendant's sister complained to the officers that the defendant was a "nuisance," that he was frequently "in possession of firearms," that "she wanted him out of the house[,] and that she just wanted him gone, didn't want to deal with him anymore."  Id. at 167:19-168:1; see also id. at 13:22-25.  The defendant's sister also appeared to express her frustrations to her mother.  See id. at 168:2-171:20.

---

[3]     The defendant's sister appeared to be agitated with her brother and the difficulties he had created, but was cooperative with the police.  See Apr. Tr. 21:22-22:14, 180:25-181:5.

Before leaving that night, Detective Argila re-entered the defendant's bedroom to photograph the evidence he had seen to use in a potential search warrant application. See id. at 14:13-18, 24:3-6. He first took photographs of the shell casings he had initially seen on the bed, but then while in the bedroom he noticed and photographed additional ammunition on top of the mini-fridge in the room and a firearm sitting on the closet shelf. See id. at 55:16-56:7; see also DX B-7 (shell casings on bed), DX B-4 (ammunition on mini-fridge), DX B-9 (partial view of firearm on shelf).

When Detective Argila and other officers left that night, two officers, including Officer Puccia, remained in the apartment to safeguard the defendant's bedroom. See Apr. Tr. 150:2-14, 151:24-25, 183:4-9. Officer Puccia had limited interactions with Ms. Garcia and the other family members, although Ms. Garcia provided him with a blanket when he began to doze off. See id. at 152:4-11. Eventually, Ms. Garcia went to bed. See id. at 152:12-18, 157:15-22.

The following day, on June 29, 2019, Detective Argila spoke to an Assistant District Attorney, who told him that no search warrant was necessary and that he could simply seize the evidence he had seen in plain view. See id. at 14:19-15:4, 101:2-4. Because the officers believed that additional firearms might be hidden in the room, however, they decided to seek Ms. Garcia's consent for a fuller search of the room, with the plan to seize only the plain-view evidence if she refused. See id. at 24:10-13, 25:1-3, 99:7-100:5. Because Ms. Garcia spoke Spanish, the officers brought a Spanish-speaking officer with them, Officer Michael Garcia. See id. at 24:21-25, 117:4-11.

When the officers returned to the apartment, they provided Ms. Garcia with a Spanish-language consent to search form, which Officer Garcia explained to her in Spanish,

at Detective Argila's request.  See Apr. Tr. 111:20-23, 118:13-121:4, 126:10-14, 126:21-23, 132:12-20.  To the officers present, Ms. Garcia appeared to understand what the form said and what Officer Garcia explained to her.  See Apr. Tr. 29:22-25, 121:5-7, 126:5-9.  Ms. Garcia signed the form, which advised her that she had the right to refuse to consent and that she had the right to revoke her consent.  See GX 10 (signed consent-to-search form); Apr. Tr. 125:11-19 (translation of form); see also GX 12 (video of Ms. Garcia signing the form).  By signing the form, Ms. Garcia also affirmed that she was giving her "consent voluntarily, intelligently, without threats or promises."  GX 10 (signed form); Apr. Tr. 125:22-23 (translation of form).

As she had been the night before, Ms. Garcia was calm and cooperative throughout the encounter, and did not appear frightened.  See Apr. Tr. 27:7-20, 121:5-7, 127:11-16, 174:9-12.  After signing the form, she served Officer Garcia coffee, which he drank at the kitchen table while making small talk with her, including discussing their shared Colombian heritage.  See id. at 128:3-21.

Following Ms. Garcia's provision of consent, the officers (except Officer Garcia, who remained chatting with Ms. Garcia) proceeded to search the defendant's bedroom, where they recovered the evidence they had previously observed (including the firearm on the closet shelf) as well as two additional firearms, one hidden in a ceiling light fixture and one hidden inside the wall.  See GX 13 (video of search); Apr. Tr. 31:23-32:1.

## ARGUMENT

The facts set forth above demonstrate that the defendant's motion must fail. Indeed, based largely on undisputed evidence, Ms. Garcia's consent to the search on June 29, 2019 was objectively voluntary: she was not in custody, she was not threatened, and she was

provided with and signed a consent-to-search form advising her of her right to consent, which form was also explained to her in Spanish.

The defendant's claim that Ms. Garcia's consent was tainted by the officers' purported illegal entry into the apartment on June 28, 2019 is without merit. As an initial matter, Ms. Garcia's claim that officers forced their way into her apartment is not credible. But even if Ms. Garcia's testimony were credited, the motion should still be denied. Even if an initial entry is unlawful, that does not undermine an otherwise valid consent if the "taint of the initial entry has dissipated." United States v. Snype, 441 F.3d 119, 132 (2d Cir. 2006). Because over twelve hours passed from the initial entry to the request for consent and because Ms. Garcia gave written consent after the consent-to-search form was explained to her, any taint was dissipated. The consent was therefore valid, and the search was lawful.

I. The Hearing Testimony Establishes Ms. Garcia's Consent Was Voluntary

As the government set forth in its opposition brief, when a search is justified by consent, the government must establish "'that the consent was voluntary.'" Opp'n 6 (quoting Snype, 441 F.3d at 131). In assessing voluntariness, courts consider factors including:

1. the characteristics of the person consenting, such as her "youth," "lack of education" or "low intelligence";

2. the context of the consent, including "whether there was a show of force," whether the person consenting was "in custody and in handcuffs," "the length of detention," the use of "repeated or prolonged questioning", or "the use of physical punishment such as deprivation of food or sleep"; and

7

3.    the interactions between the officers and the consenting person, including whether the police had told the consenting person "that a search warrant could be obtained," whether the consenting person "previously had refused consent," whether the consenting person was provided "advice" of her "constitutional rights," and whether the consenting person "had knowledge of the right to refuse consent."

United States v. Colon-Gentile, No. 12-CR-777 (ENV), 2014 WL 2157541, at *3 (E.D.N.Y. May 23, 2014).

The evidence at the hearing demonstrates that an evaluation of each of these factors warrants a finding of voluntariness.

Ms. Garcia was not young, as she was approximately 63 years old at the time of the search. See May 19, 2021 Tr. ("May Tr.") 8:14-15. Although she had relatively little schooling, there was no indication that she was of low intelligence. See id. at 9:5-6.

Even under the defendant's version of the facts, Ms. Garcia was never in custody or handcuffs, was never subject to repeated or prolonged questioning, and was never physically punished or deprived of food or sleep by the police. Moreover, the officers credibly testified that there was never any show of force made against Ms. Garcia and that the interactions between her and the police were consistently calm and respectful.

It is also undisputed that Ms. Garcia had not previously refused consent and was never told that the police could obtain a warrant. Ms. Garcia also admitted that she was provided with a Spanish-language consent-to-search form — which she could read (id. at 9:20-10:1) — and admitted that one of the officers (Officer Garcia) read the form out loud to

her in Spanish (id. at 38:11-15).  This form advised her of her constitutional rights, including her right to refuse consent.  See GX 10.

Ms. Garcia's claims that she did not subjectively consent — even if credited — are irrelevant to the analysis.[4]  The Second Circuit addressed a similar situation in Southerland v. Garcia, where the defendant claimed that she had only consented to searches because she "mistakenly believed, based on a discussion with a neighbor, that failure to consent could lead to loss of her employment with the City."  483 F. App'x 606, 608 (2d Cir. 2012).  The Court explained that such a subjective belief was "not relevant," where her consent would have appeared voluntary to "a reasonable officer."  Id.; see also Florida v. Jimeno, 500 U.S. 248, 251 (1991) ("The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness — what would the typical reasonable person have understood by the exchange between the officer and the suspect?"); United States v. Perez, 948 F. Supp. 1191, 1202 (S.D.N.Y. 1996) ("The touchstone for the validity of consent is an objective standard of reasonableness; accordingly, the subjective state of mind of the person giving consent is irrelevant.").  Under the circumstances of this case — where it is undisputed that Ms. Garcia was provided with a

---

[4]     The foundation of Ms. Garcia's claim that she did not truly consent is her assertion that she signed the consent-to-search form without reading it.  See May Tr. 20:13-16.  Courts have long rejected such claims as incredible as a matter of law.  See Merwin v. New York, N.H. & H.R. Co., 62 F.2d 803, 804 (2d Cir. 1933) (rejecting as "incredible" testimony that "he signed each time without reading that on which he placed his signature"); United States v. Combs, No. 10-CR-360, 2013 WL 5522881, at *4 (W.D.N.Y. Jan. 22, 2013) ("I am unpersuaded by Combs' attempt to disavow the significance of those documents by claiming that she did not read them (which testimony I find to be incredible)."), report and recommendation adopted sub nom. United States v. Vendetti, No. 10-CR-360, 2013 WL 5522434 (W.D.N.Y. Oct. 3, 2013); Ctr. Cadillac, Inc. v. Bank Leumi Tr. Co. of New York, 859 F. Supp. 97, 104 (S.D.N.Y. 1994) ("The court finds it incredible that plaintiffs could sign such documents without reading their terms."), aff'd, 99 F.3d 401 (2d Cir. 1995).

consent-to-search form, which was explained to her and which she signed — any reasonable officer would have believed Ms. Garcia's consent was voluntary.

Because Ms. Garcia's consent was objectively voluntary, the search was lawful unless the initial entry into the apartment was unlawful <u>and</u> the taint from that illegal entry had not dissipated.  <u>See</u> Opp'n 6 (citing <u>Snype</u>, 441 F.3d at 132-133).  As discussed below, the evidence shows that the initial entry into the apartment was lawful and that, even if it was not, any taint had dissipated.  Ms. Garcia's objectively voluntary consent is therefore controlling and is fatal to the defendant's claim.

## II.     The Initial Entry into the Apartment Was Lawful

The evidence from the hearing shows that the initial entry into Ms. Garcia's apartment on June 28, 2019 was lawful.  Specifically, Detective Argila credibly testified that he entered Ms. Garcia's apartment only after she tried to speak to him in the hallway and then invited him inside.  <u>See</u> Apr. Tr. 9:25-10:4.  This testimony was corroborated by the other officers on scene and by video evidence.  By contrast, Ms. Garcia's claims that Detective Argila violently forced his way into the apartment is contradicted by video evidence and common sense.

### A.     Detective Argila's Testimony

Detective Argila's testimony that he only engaged with Ms. Garcia at her invitation is corroborated by video footage and Officer Morgan's testimony.  Specifically, video shows Detective Argila on the second floor, trying to hear what Ms. Garcia was saying to him from the third floor and then walking up to speak with her.  <u>See</u> GX 11 at 23:11:25-23:11:30.  Further, Officer Morgan stated that he saw Ms. Garcia trying to speak to Detective

Argila from the third floor and saw him walk up to speak with her.  See Apr. Tr. 165:12-166:1.

Detective Argila's testimony that he only entered Ms. Garcia's apartment when invited inside was also corroborated by video evidence, specifically, video showing the officers' interactions with the residents of the second floor apartment.  In the video, the officers knock on the second-floor door, wait in the hallway until invited inside, and, once inside, address the residents of that apartment in a calm and respectful manner.  See GX 11 at 23:10:20-23:14:30.  There is no reason to believe that the officers would take that approach on the second floor — where they had been told the suspect might be hiding — but take a more aggressive approach on the third floor.

Moreover, Detective Argila's testimony was corroborated by the testimony of Officer Morgan, Officer Puccia, and Officer Garcia that Ms. Garcia was calm and cooperative throughout her encounters with the police and did not appear threatened or frightened.  That demeanor is inconsistent with a claim that one of the officers had recently forced his way into the apartment against Ms. Garcia's will.[5]

---

[5]     There is no reason to doubt the testimony of Officer Garcia or Officer Puccia. Officer Garcia had no involvement in the case beyond serving as an interpreter.  See Apr. Tr. 128:22-129:3.  He did not work with the other officers involved in the case or even know them beyond having seen them around.  See id. at 130:16-20.  Detective Argila did not know Officer Garcia's first name (see id. at 97:12-20), and Officer Garcia was unsure whether he would recognize Officer Puccia if he saw him (see id. at 131:7-9).  Moreover, his testimony that he explained the form to Ms. Garcia was corroborated by Ms. Garcia, who testified that he read the form to her (see May Tr. 38:11-15), and his testimony that Ms. Garcia served him coffee and chatted with him after signing the form was undisputed.  Similarly, Officer Puccia was not involved in the initial entry into Ms. Garcia's apartment or the search on the following day, and he was not on the anti-crime team with Detective Argila and Officer Morgan.  See Apr. Tr. 113:24-114:1.

Based on the officers' testimony, it is also apparent that Detective Argila would have had no motive to force his way into Ms. Garcia's apartment. As Detective Argila, Officer Morgan, and Officer Puccia testified, the officers on the scene believed the person they were looking for lived on the first or second floor of the building. See Apr. Tr. 7:21-25, 148:3-8, 164:20-25. This testimony was corroborated by Officer Puccia's body-worn camera footage, which recorded witnesses telling him the perpetrator lived on the second floor and recorded him informing the other officers to look on the first and second floor. See GX 20 at 23:07:30-23:07:45, 23:08:00-23:08:20. None of the officers had any reason to think the defendant lived on the third floor, let alone a reason to barge into Ms. Garcia's third-floor apartment.

At the evidentiary hearings, the defendant challenged Detective Argila for not turning on his body-worn camera, claiming that the Court could draw an adverse inference against Detective Argila from that fact. The weight of case law, however, is to the contrary. As courts around the country have held, a failure to activate a body-worn camera does not support an adverse credibility finding. See United States v. Tillard, No. 18-CR-6091 (JWF) ("While each case has unique facts, courts that have addressed this issue have generally declined to make an adverse credibility finding as a result of non-compliance with [body-worn camera] activation policies."), 2019 WL 8105894, at *6 (W.D.N.Y. Oct. 4, 2019), report and recommendation adopted, No. 18-CR-6091 (FPG), 2020 WL 57198, at *5 (W.D.N.Y. Jan. 6, 2020) ("With respect to the officers' credibility, their failure to activate their body-worn cameras does not render their testimony unreliable."); United States v. Aguirre-Cuenca, No. 19-CR-141, 2020 WL 6206164, at *5 (W.D.N.C. July 17, 2020) ("Most courts that have addressed this issue have generally declined to find bad faith as a result of

non-compliance with [body-worn camera] activation policies."), report and recommendation adopted, No. 19-CR-141, 2020 WL 6216765, at *3 (W.D.N.C. Oct. 22, 2020) ("[T]his Court cannot conclude Officer Tran-Thompson acted in bad faith when he failed to activate his [body-worn camera]; thus, Defendant's argument that Officer Tran-Thompson is not credible because he acted in bad faith fails."); United States v. Griffin, No. 18-CR-100 (PP), 2018 WL 4929397, at *6 (E.D. Wis. Oct. 11, 2018) (crediting officer who did not turn on body-worn camera absent demonstrated "history of failing to activate his body camera").

Moreover, here, Detective Argila offered a credible explanation for why he had not turned on his body-worn camera: He did not initially turn his camera because other officers were already on scene with their body-worn cameras activated. See Apr. Tr. 39:7-12. The only time he was not with other officers with activated body-worn cameras was his three minutes alone with Ms. Garcia, when he believed he was speaking to a potential witness with no involvement in the case. See id. at 39:18-40:17, 42:12-43:2. When he observed the evidence inside the apartment, he did not think to turn on his body-worn camera to record the evidence, since the evidence was in a place where it could be frozen without an adversarial situation. See id. at 44:8-45:8. And moments later, other officers with their body-worn cameras on arrived at the scene and recorded the evidence. See GX 11 at 23:14:40-23:17:00.

Detective Argila's testimony was corroborated and credible. The Court should credit his testimony and find the initial entry lawful on that basis.

B.    <u>Ms. Garcia's Testimony Was Not Credible</u>

Ms. Garcia's claim that Detective Argila forced his way into her apartment is false. In many instances, her testimony is inconsistent with video evidence or other parts of her own testimony. In other instances, her testimony defies common sense.

For example, Ms. Garcia stated that the first time any officers spoke to her on the night of her son's arrest, "they knocked on my door very hard and then the first thing they asked me was which one was his room and I just pointed at it." May Tr. 13:4-6. This version of events suffers from several flaws.

First, video evidence shows that Ms. Garcia's interaction with the police did not begin with them knocking on their door. Rather, the video shows Detective Argila looking up from the second floor when Ms. Garcia tried to speak to him from the third floor landing. <u>See</u> GX 11 at 23:11:25-23:11:30.

Second, as noted above, the officers all believed the suspect lived on the first or second floor, giving them no reason to search the third floor apartment, let alone to enter the apartment in the manner described by Ms. Garcia.

And third, even if the officers had a reason to go to the third floor at all, they had no reason to seek out the defendant's bedroom in particular. The officers were searching for a suspect, who could have been hiding in any room. The only reason the bedroom became a focus of the investigation was that Detective Argila happened to see shell casings on the defendant's bed through the open bedroom door after he was already inside the apartment. <u>See</u> Apr. Tr. 11:22-12:4.

Similarly, Ms. Garcia's claim that when Detective Argila entered her apartment, he "shoved" her and then ran back downstairs to knock on her landlord's door on

the second floor (May Tr. 14:7-10, 14:15-19) cannot be reconciled with video evidence or Ms. Garcia's prior testimony.

As captured on video, Detective Argila first went up to the third floor one minute after he and his partners had knocked on the landlord's door on the second floor. See GX 11 at 23:10:10-23:11:35. He then remained in Ms. Garcia's apartment at least until his partners came upstairs three minutes later. See GX 11 at 23:14:25-23:15:15. Ms. Garcia's story of Detective Argila running back and forth between the second and third floors is therefore flatly contradicted by the video evidence.

As also shown by video, Detective Argila was off-camera with Ms. Garcia for only about three minutes. By the time other officers arrived upstairs, Ms. Garcia was standing next to Detective Argila, holding a can of beer as she calmly and cooperatively provided the defendant's girlfriend's address. See GX 11 at 23:14:45-23:15:15. It is difficult to believe that in three minutes Ms. Garcia could go from the trauma of being assaulted by an intruder into her home to calmly cooperating with that intruder.

Ms. Garcia also made no mention of this alleged assault in her affidavit prepared in support of the defendant's motion to suppress, which she signed on November 12, 2019. See DX C. The absence of this key fact from an affidavit prepared just a few months after the incident is inexplicable.

The government submits that Ms. Garcia's testimony at the hearing was not credible and was clearly affected by her familial, and often difficult, relationship with her son. See May Tr. 25:5-26:6 (Ms. Garcia testifying that she "love[s]" her son and worries about him, but that their relationship has not been easy). As one example, when asked if she had ever called the police and told them her son had threatened her with an axe, she denied it.

<u>See</u> <u>id.</u> at 26:15-27:6.  When presented with a signed statement reading, "My son threaten [sic] me with a axe.  He wanted to kill me." (GX 50 at 2), Ms. Garcia admitted signing the statement (May Tr. 31:4-10) but insisted that she had signed the statement without reading it or understanding its contents (<u>id.</u> at 32:14-21) — the very same claim she makes about her signature on the consent-to-search form that was the subject of the evidentiary hearing.  In addition, Ms. Garcia has demonstrated a willingness to act dishonestly in order to assist her son in this case.  On the night after the first evidentiary hearing, on April 30, 2019, the defendant called Ms. Garcia from jail using another inmate's identification number.  As captured on the recorded call, Ms. Garcia warned the defendant that she had been told by defense counsel not to speak with the defendant about the hearing and instructed him to call her using another inmate's identification number.  When the defendant assured her that he <u>was</u> using another inmate's number, she proceeded to discuss the officers' testimony at the hearing in detail.  <u>See</u> RG000368-RG000397.

The Court should credit the corroborated, sensible testimony of the officers over the contradictory and illogical testimony of Ms. Garcia.  That testimony shows that there was no illegal entry into Ms. Garcia's apartment, and Ms. Garcia's objectively voluntary consent to the search is therefore determinative.

III.    <u>Even Under the Defendant's Facts, the Search was Lawful</u>

Even if Ms. Garcia were credited, the motion should still be denied.  As set forth in the government's opposition brief, even where a consent to search was preceded by a prior illegal entry onto the premises, the search is still valid if the taint from the initial entry had "dissipated."  <u>See</u> Opp'n 10-13.  In determining whether the taint has dissipated, courts consider three factors:  "(1) 'the temporal proximity of the illegal entry and the alleged

consent,' (2) 'the presence of intervening circumstances,' and (3) 'the purpose and flagrancy of the official misconduct.'" Opp'n 10 (quoting <u>Snype</u>, 441 F.3d at 134).

For the reasons set forth in the government's opposition brief, those factors weigh decisively in favor of dissipation here. The 12-hour gap here is significantly longer than the several minutes found sufficient in numerous other cases. <u>See</u> Opp'n 11 (citing cases). The arrival of Ms. Garcia's daughter (who expressed a desire to have the defendant out of the house), the opportunity for Ms. Garcia to spend the night alone in her bedroom, the arrival of a Spanish-speaking officer with whom she apparently had a good rapport, and the provision of a consent-to-search form advising Ms. Garcia of her rights were all intervening circumstances. <u>See</u> Opp'n 11-12 (citing cases including <u>United States v. Oguns</u>, 921 F.2d 442, 447-48 (2d Cir. 1990) (finding dissipation of taint where "the agents read to Oguns a consent to search form, indicating Oguns' right to refuse to consent to a search")). And there was no logical investigative purpose for Detective Argila to have made an illegal entry. <u>See</u> Opp'n 12 (quoting <u>United States v. Murphy</u>, 703 F.3d 182, 192 (2d Cir. 2012) (conduct is purposeful and flagrant if, among other things, "the misconduct was investigatory in design and purpose and executed in the hope that something might turn up")). Notably, the defendant did not cite a single case in his opening brief or his reply finding that a taint had not been dissipated under similar facts.

Thus, even if the Court were to credit Ms. Garcia — or even if the Court made no credibility determinations — the Court should find that any taint from the alleged unlawful entry would have dissipated and that Ms. Garcia's objectively voluntary consent to search was therefore valid. Accordingly, the motion should be denied.

IV.   The Government's Letter Discussing Officers' Disciplinary Records Was Properly
      Filed Under Seal

At the end of the May 19, 2021 hearing, the defendant moved to unseal the

government's April 16, 2021 letter, which provided detailed descriptions of certain

witnesses' disciplinary records in order to satisfy the government's obligations pursuant to

Giglio v. United States, 405 U.S. 150 (1972).  See May Tr. 48:12-49:1.  Such records are

routinely filed under seal in both criminal and civil matters, especially where (as here) the

records contain unsubstantiated allegations and where the disciplinary matters are irrelevant

to the case.  See, e.g., Fernandez v. City of New York, 457 F. Supp. 3d 364, 401 (S.D.N.Y.

2020) ("Given that [the officers'] disciplinary records have only slight relevance here, and

contain unsubstantiated allegations of misconduct, [the officers'] privacy interests trump the

presumed right of access to judicial documents.").  There is no justification for a different

result here.  The defendant's motion should therefore be denied.

<u>CONCLUSION</u>

For the reasons stated herein, the Court should deny the defendant's motion.

Dated:    Brooklyn, New York
          July 8, 2021

                              Respectfully submitted,


                              JACQUELYN M. KASULIS
                              ACTING UNITED STATES ATTORNEY
                              Eastern District of New York
                              271 Cadman Plaza East
                              Brooklyn, New York 11201


                       By:    /s/
                              Jonathan Siegel
                              Genny Ngai
                              Assistant United States Attorneys
                              (718) 254-7000