UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------x
UNITED STATES OF AMERICA,

                Plaintiff,

    -against-

RODOLFO GARCIA,

                Defendant.

------------------------------------------------x

**MEMORANDUM AND ORDER**

Case No. 1:19-cr-410-FB-1

*Appearances*:
*For the Plaintiff*:
JACQUELINE M. KASULIS
Acting United States Attorney
Eastern District of New York
By: JONATHAN SIEGEL
GENNY NGAI
Assistant United States Attorney
271-A Cadman Plaza East
Brooklyn, New York 11201

*For the Defendant*:
SUSAN J. WALSH
Vladeck, Raskin & Clark PC
565 Fifth Avenue
9th Floor
New York, NY 10017

**BLOCK, Senior District Judge:**

Rodolfo Garcia ("Garcia") stands charged with unlawful possession of a

firearm following a felony conviction in violation of 18 U.S.C. §§ 922(g)(1) and

924(a)(2). He moves to suppress physical evidence seized from an apartment

belonging to his mother, Margot Garcia ("Ms. Garcia").[1] The parties do not dispute

his standing to seek this relief.

---

[1] Garcia also moves to suppress statements he made to police after his arrest. Because
the Government "does not intend to admit [Garcia's] post-arrest statements at trial,"
that branch of Garcia's motion is moot. Gov. Resp. at 18.

1

Garcia alleges that the officers unlawfully entered and searched his mother's apartment on the night of June 28, 2019 and in the early morning hours of June 29, 2019. Although he acknowledges that his mother signed a consent form on June 29, he argues that her consent was involuntary, uninformed, and tainted by the prior night's illegal conduct.

The Government responds that Ms. Garcia voluntarily allowed Argila to enter her apartment on June 28. Once inside, Argila saw shell casings in Garcia's room in plain view. The Government contends that, based on this discovery, Argila returned to the room and conducted a protective sweep of Garcia's room. Finally, the Government argues that Ms. Garcia's June 29 consent to search was voluntary and untainted by the officers' prior conduct.

Having carefully considered the parties' arguments, the Court finds that (1) police officers unlawfully entered Ms. Garcia's apartment on the evening of June 28, 2019, (2) Ms. Garcia's June 29, 2019 consent to search was involuntary, (3) the officers' illegal entry "tainted" her consent, and (4) subsequent events did not dissipate the taint. Accordingly, Garcia's motion is granted.

## I. Factual Background

The Court held two evidentiary hearings, the first on April 30, 2021 and the second on May 19, 2021. New York City Police Department ("NYPD") Detective James Argila ("Argila") and NYPD Officers Michael Garcia ("Officer Garcia"),

Justin Puccia ("Puccia") and Kevin Morgan ("Morgan") testified at the first hearing. Ms. Garcia testified at the second, with the assistance of a court certified interpreter. After the hearing, the Court ordered the parties to file supplemental briefs.

## A.     Officers Canvass 266 McKinley Avenue

On June 28, 2019, Argila, Morgan, Puccia, NYPD Officer Austrie Whirl ("Whirl") and other NYPD personnel responded to a report of "shots fired" and a possible robbery at 266 McKinley Avenue in Brooklyn, New York. The building at that location is a three-story residential building with three apartments. Argila testified that, either upon or shortly before their arrival around 11:00 PM, he and his colleagues "were informed that [other] officers. . . found shell casings outside of the building and were. . . told that the person who fired the gun went into 266 McKinley and probably lived on the first or second floor." Tr. 1 at 7.[2]

Argila, Morgan and Whirl began a floor-by-floor search of the building. All three officers were wearing body cameras, and some of their progress through the building was captured on Whirl and Puccia's cameras. The officers knocked on the door to the first-floor apartment but received no response. They repeated this procedure on the second floor. This time, a woman answered. The woman was eventually joined by a man and a child. They spoke to the officers for about 5 minutes.

---

[2] The citation "Tr. 1" refers to the transcript of the hearing held on April 30, 2019.

While this conversation took place, Ms. Garcia stepped out of her third-floor apartment and leaned over the bannister. Gov. Ex. 11 (Whirl's Camera) at 23:11:25-23:11:30. Argila saw her and believed she was "trying to say something to [the officers]," although he was unable to hear "what she was saying." Tr. 1 at 9. Construing this behavior as an invitation to speak, Argila proceeded upstairs.

**B.      Argila Enters Ms. Garcia's Apartment**

The parties dispute what happened next. Argila did not activate his body camera before going upstairs or speaking to the woman. Morgan and Puccia's body cameras do not show his ascent or actions on the third floor. Whirl's camera captured the beginning of Argila's ascent but does not show what occurred on the third floor. Gov. Ex. 11 (Whirl's Camera) at 23:11:36. The Court is therefore constrained to recount and assess the parties' conflicting testimony.

**1.      Argila's Testimony**

Argila is a 13-year veteran of the NYPD. He does not speak Spanish. He was in plainclothes on the evening of June 28.

Argila testified that Ms. Garcia "waved" him into her apartment and began to show him around. Tr. 1 at 10. He further claims that he walked with Ms. Garcia down the main hallway of her apartment toward its two back bedrooms. On the way there, they passed a third bedroom, which belongs to Garcia. When they reached the two back bedrooms, Ms. Garcia offered to open a locked closet. However, Argila declined her offer because opening the closet "was not necessary" since Argila had not "come

4

to search [Ms. Garcia's] apartment," and because he "didn't think [Ms. Garcia] had anything to do with [the gunfire]." *Id.* at 11. While all this was happening, Ms. Garcia and Argila tried to speak to each other, but Argila could communicate "very little" to her. *Id.* at 10.

Argila further testified that, after declining to view the contents of the closet, he followed Ms. Garcia back down the hallway. This time, he noticed the third bedroom. Although the room's door was only "halfway" or "three-quarters" open, Argila saw "on top of the mattress, on top of the [bluish-gray] comforter, that there were shell casings in plain view." *Id.* at 12; *see also* Def. Ex. B-1 (photograph of hallway); Def. Ex. B-2 (photograph of partially open bedroom door); Def. Ex. B-7 (photograph of shell casings on mattress). Argila testified that he was about eight feet away from the comforter and was able to see shell casings which are approximately 1.5 to two inches long. *See* Def. Ex. B-7 (depicting shell casings).

The only available photograph of the casings depicts a red screwdriver pointing directly at the casings, which otherwise blend into a grey-black geometrically patterned bedsheet. Because the photograph was taken from above, it could not have been taken from Argila's vantage point in the hallway. *See* Def. Ex. B-7; *see also* Tr. 1 at 54-55 (affirming, in Argila's testimony, that he "went into the bedroom to take photographs" after the other officers had entered the apartment). It is therefore unclear whether the red screwdriver was present when Argila first saw the casings, or whether

5

one of the officers placed it there. *See also* Tr. 1 at 88 (Argila's testimony that he did not place the screwdriver on the bedsheet).

After viewing the casings, Argila inquired as to the bedroom's occupant. Ms. Garcia told him that her son, Rodolfo Garcia, lived there.

## 2.    Ms. Garcia's Testimony

Ms. Garcia is a 65-year-old woman with a fourth-grade education. She cannot read English and speaks very little of it. She takes "two different kinds of [anxiety] medication," has not worked outside the home in 30 years and relies on Social Security Disability Income. Tr. 2 at 11.[3]

Ms. Garcia denies ever "waving" Argila or any of the officers into her apartment. *Id.* at 13 ("Q. [Did] you open the door and tell [Argila] to come in? A. No, not at all"). She testified that her encounter with Argila began when the officer "knocked on [her] door very hard and then. . .asked [her] which [room] was [Garcia's] room," and she "just pointed at it." Tr. 2 at 13. Argila proceeded to "shove" past Ms. Garcia and "look into [Garcia's] room." *Id.* He then started asking Ms. Garcia "like a mad man [*sic.*], like which one is [Garcia's] room," but Ms. Garcia could not understand exactly what Argila said. *Id.* at 15. Ms. Garcia tried to ask him "what was going on" but got no response. *Id.* at 13-14.

---

[3] The citation "Tr. 2" refers to the transcript of the hearing held on May 19, 2021.

Ms. Garcia next testified that Argila "went downstairs, running," but this is contradicted by Whirl's body camera, which does not show Argila returning to the second floor. *Compare* Tr. 2 at 14 *with* Gov. Ex. 11 at 23:10:10-23:11:35. By contrast, the video supports her testimony that several officers eventually joined Argila in the apartment, although her account of the timing does not square with the video's timestamps. *Compare* Tr. 2 at 15 (stating, variously, that the other officers entered "right away" and "seven minutes" after Argila came in) *with* Gov. Ex. 11 at 23:11:27-23:15:15 (showing 3-4 minute delay between Argila's entry and the entry of other officers). The video evidence also corroborates Ms. Garcia's testimony insofar as it shows that the door to the apartment was wide open when Whirl entered the apartment. *See* Gov. Ex. 11 at 23:14:42.

Ms. Garcia stated that she felt "very scared" when the officers entered her apartment, and that she "didn't know what was going on." Tr. 2 at 15. None of the officers spoke to her in Spanish. All were men.

## C.    The Officers "Freeze" Garcia's Room Overnight

Not long after Argila spotted the shell casings on Garcia's bed and the other officers entered the apartment, Garcia's sister and niece (together with Ms. Garcia, "Garcia women") returned to the apartment. *See* Gov. Ex. 11 at 23:14:43-23:15:15**.** The officers proceeded to "freeze" Garcia's room, a task they accomplished by ordering the Garcia women to stay out of the room. The Garcia women were then ushered to the front of the apartment and seated at a table, while Argila reentered

7

Garcia's bedroom and took several photographs of objects he claimed were "in plain view." Tr. 1 at 55. Argila acknowledged that he took photographs in order "to get a search warrant" but only disclosed the photographs under cross-examination on the day of the suppression hearing. Tr. 1 at 55; *see also id.* at 59-60 (acknowledging nondisclosure). He testified that the objects included "one firearm on the shelf in the closet, the shell casings on the mattress. . . loose rounds on the mini-fridge" and possibly "marijuana in a glass jar." *Id.* at 55*; see also* Def. Exs. B-1–B-7. (photographs). However, when shown a photograph of the mini-fridge the stand, he was unable to locate the "loose rounds." Argila left shortly after taking the photographs.

While Argila took photographs, the Garcia women sat around the table. The Government witnesses describe the Garcia women as "calm" and "cooperative," while Ms. Garcia states that the policemen were "keeping an eye on" them, "made them sit. . . [and told them] they couldn't stand up," and required them to "ask permission to go to the bathroom." *Compare* Tr. 1 at 21, 151, 153, 158-59, 172-73 *with* Tr. 2 at 17.

The Garcia women stayed at the table until around 2:30 or 3:00 AM, at which time they went to their bedrooms. Tr. 2 at 18. Two armed, uniformed officers remained in the apartment overnight to guard the "frozen" room, one of whom was Puccia. Tr. 1 at 97. At some point, Ms. Garcia offered Puccia a blanket. Ms. Garcia testified that the presence of officers made it hard for her to sleep because she heard

the officers moving around outside and "thought that thieves had gotten in." Tr. 2 at 18.

Puccia and the other officer were still present when the Garcia women awoke the next day. Ms. Garcia testified that the uniformed officers refused her daughter and granddaughter permission to leave the apartment until a female officer arrived to perform a "complete body check." *Id.* The younger women were, however, permitted to leave at some point.

### D.     The Officers Return to Ms. Garcia's Apartment

The next morning, Argila contacted Assistant District Attorney Jagnor Lali of the Kings County District Attorney's Office. Tr. 1 at 101. Attorney Lali "told [Argila] that a warrant was not necessary," and that the officers should "continue searching for more than what was in plain view." *Id.* at 101, 103. Argila's partner, Morgan, testified on cross-examination that he understood this instruction to mean that he should "get a consent" to search the apartment, and Argila's testimony suggests that he understood it similarly. *Id.* at 188 (Morgan's testimony); 24 (Argila's testimony).

Shortly before noon on June 29, 2019, at least five officers returned to the apartment. Ms. Garcia was now alone with five to seven armed policemen. Tr. 1 at 135, 180. Among the officers were Argila, Whirl, and Officer Garcia (no relation to Ms. Garcia), who acted as a Spanish language interpreter. *Id.* at 24. There is no body camera footage of the initial interactions between Ms. Garcia and these officers, but Ms. Garcia testified that the officers told her that she "had to sign" the Spanish-

9

language consent form they had brought because "they had to take the . . . evidence with them." Tr. 2 at 20-21. She further testified that the officers told her that "if [she] didn't sign, the other guys [i.e. the two uniformed officers] couldn't leave," and that she had not been told she could refuse to sign or change her mind once a search began. *Id.* All of this made Ms. Garcia "very nervous" because she "had never been through something like [it] in [her] life." *Id.*

The officers' body camera footage memorializes Ms. Garcia's signing of the form and the interactions immediately preceding it. The video shows Officer Garcia standing over Ms. Garcia and telling her what to write on a consent form. Gov. Ex. 12 (Argila's Camera) at 12:09:00-12:12:17. The Spanish language form states, among other things, that the person signing "consents voluntarily to a complete search" by the NYPD, that she "has been advised of [her] right to refuse consent before any search is conducted" as well as of her right "to revoke [her] consent at any time, either in part or altogether." It further states that the person signing "consents knowingly, voluntarily, and intelligently, without threats or promises of any kind." Gov. Ex. 10.

However, Officer Garcia mistranslated the form in a few relevant particulars. *See* Tr. 1 at 124-25. Notably, he translated the sentence "Yo he sido aconsejado de mi derecho a rehusar a este consentimiento antes de que cualquier búsqueda se conduzca [I have been advised of my right to refuse consent before any search is conducted]" as "I have been advised of my right. . . to stop this consent before it begins, before it's

10

conducted," and the phrase "sin amenazas o promesas de ninguna clase [without threats or promises of any kind]" as "without threats or promises of any case." Tr. 1 at 125. Búsqueda, *Lexico Spanish-English Dictionary*, https://www.lexico.com/es-en/traducir/busqueda (last accessed Jul. 21, 2021) (translating the Spanish word "búsqueda" as "search"); *Ninguna Clase*, *Reverso-Context Spanish-English Dictionary*, https://context.reverso.net/translation/spanish-english/ninguna+clase (last accessed Jul. 21, 2021) (translating the Spanish phrase "ninguna clase" as "any kind").

While watching the body camera footage at the April 30 hearing, the Court observed that Ms. Garcia appeared "hesitant" when confronted with the consent form. Tr. 1 at 119. The Court therefore asked Officer Garcia—who was testifying at the time—"what was going on" in the moments before the consent form was signed. *Id.* In response, Officer Garcia stated that he believed Ms. Garcia was hesitant because "she wasn't sure where to note her name," and that she became calmer when he helped her fill out the form. *Id.* This is consistent with Ms. Garcia's testimony that Officer Garcia "told [her] to write my address here, to put my name here, to write this down, to write this other thing down," and that he ultimately directed her where to sign. Tr. 2 at 20-21. *See also* Gov. Ex. 12 at 12:11:18 (Officer Garcia shows Ms. Garcia how to spell the English word "bedroom").

Ms. Garcia further testified that she "did not read" the consent form and merely followed Officer Garcia's directions. Tr. 2 at 20. She did not believe she could refuse consent. *Id.* at 21 ("Q. [Did] you understand that you could say no, you can't come in, you can't search to the police? A. I didn't know"). She therefore signed the form.

The officers proceeded to search Garcia's bedroom. They uncovered multiple firearms and ammunition.

## II. Legal Standards

### A.    Consent

"Physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *Payton v. New York*, 445 U.S. 573, 585 (1980) (internal quotations and citations omitted). The "Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." *Id.* at 590. Where there is neither a warrant nor exigent circumstances, government agents may enter a home only if the homeowner gives voluntary consent. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) ("one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent") (internal citations omitted); *United States v. Elliott*, 50 F.3d 180, 185 (2d Cir. 1995).

Consent is voluntary if it has not been "coerced, by explicit or implicit means, by implied threat or covert force" and is not "granted only in submission to a claim of

12

lawful authority." *Bustamonte*, 412 U.S. at 228, 233; *see also United States v. Snype*, 441 F.3d 119, 131 (2d Cir. 2006). Voluntariness is determined by reference to the "totality of the circumstances," which means that the Court's analysis must "reflect careful scrutiny of all the surrounding circumstances," including the "characteristics of the [consenting person]." *Bustamonte*, 412 U.S. at 226. Among the nonexclusive factors the Court may consider are "the youth of the [consenting person], his lack of education, his low intelligence, the lack of any advice. . . of his constitutional rights, the length of detention, the repeated and prolonged nature of questioning, whether the [consenting person] was in custody and in handcuffs, whether there was a show of force, whether the [government] agents told the [consenting person] that a search warrant would be obtained, whether the [consenting person] had knowledge of his right to refuse consent, and whether [the consenting person] had previously refused consent." *United States v. Schaefer*, 859 F. Supp. 2d 397, 407 (E.D.N.Y. 2012) (cleaned up) (internal quotations and citations omitted). These factors guide the Court's analysis of the "ultimate question presented," which is "whether the officer had a reasonable basis believing that there had been consent to search." *United States v. Garcia*, 56 F.3d 418, 423 (2d Cir. 1995) (internal citations omitted).

The Government has the burden of showing, by a preponderance of the evidence, that a homeowner's consent is freely and voluntarily given. *Snype*, 441 F.3d at 131. This means that the Government must show that the facts demonstrating

consent are "more probably true than false." *Nissho-Iwai Co. v. M/T Stolt Lion*, 719

F.2d 34, 38 (2d Cir. 1983).

**B.     Taint and Dissipation**

"When a consent [to search] follows an illegal entry, [the Second Circuit]

requires the government to show more than the voluntariness of the consent, it must

also demonstrate that the 'taint of the illegal entry has been dissipated in order to

admit evidence seized following the illegal entry." *Snype*, 441 F.3d at 132; *see also*

*United States v. Murphy*, 703 F.3d 182, 190 (2d Cir. 2012). The "separate taint"

inquiry "does not hinge on a simple but for analysis and must be answered on the facts

of each case." *Snype*, 441 F.3d at 134 (internal citations and quotations omitted).

The Court weighs four factors to determine whether there has been a "break in

the causal chain" between Government misconduct and the search or seizure of

evidence. *United States v. Ceballos*, 812 F.2d 42, 50 (2d Cir. 1987). They are: "(1) the

giving of *Miranda* warnings, (2) the temporal proximity of the illegal entry and the

alleged consent, (3) the presence of intervening circumstances, and (4) the purpose

and flagrancy of the official misconduct." *Snype*, 441 F.3d at 134 (quoting *Kaupp v.*

*Texas*, 538 U.S. 626, 633 (2003)).

### III.

For the following reasons, the Court holds that the Government has not

sustained its burden of proof to show that it obtained consent from Mrs. Garcia to

enter her apartment on June 28 and to search it the following day.

14

## A. Entry of June 28, 2019

**1.     Failure to Activate Body Camera**

On January 8, 2018, the New York Police Department added Procedure No. 212-123 to its Patrol Guide to provide, *inter alia,* for the mandatory activation of Body-Worn Cameras by unformed officers: (1) "prior to engaging in, or assisting another uniformed officer, with. . . potential crime in progress assignments, including. . . shots fired [and]. . . any incident involving a weapon;" and (2) before entering "any privately owned buildings." The Procedure also prohibits deactivating the camera until an "investigative, enforcement or other police action is concluded." New York City Police Dep't, *Patrol Guide*, Proc. No. 212-123 ("Use of Body-Worn Camera") (2018). Laws requiring police officers to use body cameras have been passed—or are under consideration—across the country.  In New York State, the legislature recently required state police officers to wear body cameras while on patrol. *See* N.Y. Exec. L. § 234 (2021). As "Justification" for the law, it noted the "trust deficit between communities and the police" and reported that:

> There are many studies, which have been conducted, that show a
> direct co-relation between the usage of body-worn cameras and a
> drop in use of force incidents, and citizen's complaints against police
> officers. Most recently, the police department in Rialto, California,
> conducted a study which showed that in the test period in which they
> enacted a policy for patrol officers to wear body-worn cameras, use
> of force incidents, and citizen complaints dropped by 50 and 90
> percent respectively.

N.Y.S.B. S8493 (2020), https://www.nysenate.gov/legislation/bills/2019/s8493

(last accessed Aug. 9, 2021).

15

The NYPD Patrol Guide is a "training manual intended to provide guidance on the most common practices of the [NYPD] and [to] serve as performance expectations." *Griffin v. Cty. of N.Y.*, 880 F. Supp. 2d 384, 397 n.3 (E.D.N.Y. 2012). And while it may not have the formal status of law, *see id.* (commenting that the Patrol Guide "is not law"), the Second Circuit has effectively treated it as binding when defining the official duties of police officers in civil cases. *See Matthews v. Cty. of N.Y.*, 779 F.3d 167, 174 (2d Cir. 2015). Moreover, it provides a wide range of internal punishments for violations of its body camera mandates. New York City Police Dep't, *Disciplinary System and Penalty Guidelines*, pp. 43-44 (2021) (prescribing a range of sanctions for an officer's improper failure to activate a body camera, up to a maximum of 30 "penalty days").

Whether the Patrol Guide's body camera mandates carry the force of law need not be resolved, however. It is clear that legal consequences flow from their violation.

Because of the relatively recent advent of police body cameras, there is a dearth of caselaw assessing the evidentiary consequences of a police officer's failure to comply with body camera mandates where the Fourth Amendment is implicated. And none from any circuit courts.

The smattering of district court authority seems to fall into three categories. First, some courts hold that failure to activate does not, by itself, support a finding of bad faith

16

for purposes of Due Process analysis. *See, e.g.*, *United States v. Taylor*, 312 F. Supp. 3d 170, 178 (D. D.C. 2018) (an officer's "failure to activate his body-worn camera does not constitute prima facie evidence of bad faith in failing to collect and preserve additional evidence"); *United States v. Brown*, No. 17-CR-58, 2018 WL 451556, at *3 (D. Nev. Jan 16, 2018) ("Here, the fact that the officers failed to adequately record the events using their [body cameras] is more indicative of negligence than of bad faith").

Others hold that failure to activate "deprives the Court of the best evidence available." *See United States v. Gibson*, 366 F. Supp. 3d 14, 26-7 (D.D.C. 2018) (rejecting contested "portions of [an officer's] testimony" because "[by] failing to adhere to [police department] policy and activate their body-worn cameras, the . . . officers deprived the Court from reviewing the best evidence available").

Finally, a third group holds that failure to activate can be a factor in assessing an officer's credibility, which can tilt the credibility analysis in a close case where the officer's testimony is controverted. *See, e.g.*, *United States v. Carter*, -- F. Supp. 3d --, 2021 WL 698856, at *3 (D. Nev. Feb. 23, 2021) (an officer's "seemingly strategic. . . deactivation of the body camera. . . in violation of department policy as well as his unconvincing and less than credible testimony simply cannot establish that [the officer] obtained consent to search"); *United States v. Tillard*, No. 18-CR-6091, 2019 WL 8105894, at *6 (W.D.N.Y Oct. 4, 2019) ("To be sure, there may be situations where the lack of recording might tip the balance in favor of a defendant's version of events in a

close case"), *adopted by* 2020 WL 57198 (Jan. 6, 2020); *United States v. Griffin*, No. 18-CR-100, 2018 WL 4929397, at *4 (E.D. Wis. Oct. 11, 2018) (same).

In the present case, Argila knew that he was required to activate his body camera before entering Ms. Garcia's apartment on June 28, 2019 and while speaking with her. He offers several unconvincing reasons why he failed to do so. *See* Tr. 1 at 39-42 (Argila's testimony that he did not activate his camera "because there were other officers already on the scene;" "because [he] thought [he] was talking to a potential witness;" and because "he didn't think that there was going to be any adversarial encounter"). None of these rationales square with the prescriptions of the Patrol Guide.

But ultimately, Argila's excuses do not matter. Regardless of his myriad excuses for non-compliance, it is clear that if Argila had activated his body camera before entering the building and while confronting and talking with Ms. Garcia, the Court would have irrefutable proof of what had occurred. Therefore, the Court would not be faced with the need to square the officer and homeowner's conflicting testimony. Because Argila is responsible for depriving the court of the best and dispositive evidence in this case, the Government has failed to sustain its burden of proof to justify its warrantless entry. *See Gibson*, 366 F. Supp. 3d at 26-7.

The Court would reach the same conclusion if this were a close case because it embraces the rationale of those district courts which have held that the failure to activate

18

the body camera is an adverse credibility factor, which would here tilt the case against the Government.

**2.      Other Concerns About Argila's Testimony**

The Court is troubled by Argila's failure to disclose important evidence until the day of the hearing. Argila used his personal cell phone to take several photographs of Garcia's room on June 28 and in the early hours of June 29. At the hearing, Argila testified that he knew he was "required to turn over everything [he had] about the file to the prosecutors," including his photographs, but he did not actually do so until cross-examination revealed his lapse. Tr. 1 at 77. He further testified that he had not turned this important evidence over because he did not know it was on his phone. *Id.* at 78 ("I don't know what's on my phone").

While the Court does not believe that Argila concealed evidence in bad faith, his handling of the evidence in this case was negligent. *Cf. Taylor*, 312 F. Supp. 3d at 178-79 (holding that an officer's failure to collect and preserve evidence in violation of departmental policy was not *prima facie* evidence of *bad faith* because it was attributable to "mere negligence or oversight"); *Brown*, 2018 WL 451556, at *3; *see also Arizona v. Youngblood*, 488 U.S. 51, 57 (1988). When important rights are at stake, the Court is unwilling to rely on the testimony of a negligent officer.

Moreover, Argila's account is difficult to reconcile with the photographs he belatedly disclosed. Two of them (Def. Exs. B-2, B-3) depict the door to Garcia's room, which appears to be either "halfway" or "three quarters" open. Although it is

19

possible that Agila saw the 1.5 to two-inch-long shell casings through this door, the Court is barely able to discern the interior of the room in the photograph taken from the hallway (Def. Ex. B-2). Given that the shell casings are nearly the same color as the bedsheet on which they were found, it is implausible that Argila was able to see them clearly from eight feet away, in the hallway. *See* Def. Ex. B-7 (showing shell casings). Indeed, Argila was unable to locate other shell casings in photographs on the stand, which were closer to him than the real shell casings were on June 28. Finally, the presence of the red screwdriver—which lies atop the bedsheet, pointing toward the shell casings like an arrow—amplifies the Court's doubts. Def. Ex. B-7. The placement and orientation of the bright red tool are improbably convenient for the Government.

**3.    The "plain view" exception is inapplicable.**

In light of the foregoing, the Government cannot show that Ms. Garcia consented to Argila's entry, and the Government cannot avail itself of the "plain view" exception.

 "Under the plain view exception, if police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant." *United States v. Delva*, 858 F.3d 135, 149 (2d Cir. 2017) (quoting *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993)). But an officer who enters a home without its owner's consent is not "lawfully in a position to view" anything, nor does

he have a "lawful right of access to the object" he wishes to "observe[] [or] seiz[e]." *Cf. id.* (quoting *Horton v. California*, 496 U.S. 128, 133 (1990)). Consequently, the plain view exception does not justify Argila's entry into Garcia's room or permit him to photograph the contraband he saw there.

The fruits of Argila's illegal entry must therefore be suppressed, and the Court must assess the impact of his illegal entry on the purported consent Ms. Garcia provided the next day.

### B. The June 29, 2019 Search

Because the officers illegally entered Ms. Garcia's home, the Government may prevent suppression only if it shows that (1) Ms. Garcia gave voluntary consent to search on the morning of June 29, 2019; and (2) the taint of the officers' prior illegal entry had dissipated by the time she consented. *Snype*, 441 F.3d at 132. It can make neither showing.

### 1.   Ms. Garcia's Consent was Involuntary

The record supports a finding that Ms. Garcia's consent was not voluntary under the totality of the circumstances.

### (a)   Personal Characteristics

Ms. Garcia's personal characteristics weigh lightly against a finding of consent. *Bustamonte*, 412 U.S. at 226. Ms. Garcia is not young, but she is severely lacking in education. She is also less psychologically stable than the average person and was adjudicated unable to cope with at least some of life's pressures as a prerequisite to

21

obtaining disability benefits. *See generally* 20 C.F.R. § 404.1505 (defining disability

"as the inability to do [work] by reason of any medically determinable physical or

mental impairment"). The Court therefore finds that Ms. Garcia is slightly more

vulnerable to coercion than a typical person.

**(b)     Advice of Constitutional Rights and Right to Refuse**

The parties dispute whether Ms. Garcia received "advice. . . of [her]

constitutional rights." *Schaefer*, 859 F. Supp. 2d at 407. Because it is undisputed that

the consent form would have conveyed such advice if read and understood, the

Court's assessment of this factor turns on whether Ms. Garcia read the form and

understood its contents. The Court does not believe that she did. Officer Garcia's

testimony, Ms. Garcia's testimony, and the body camera footage all suggest that

Officer Garcia guided her through the process of completing the form. Gov. Ex. 12 at

12:09:00-12:12:17; Tr. 1 at 119-20 (Officer Garcia); Tr. 2 at 20-21 (Ms. Garcia).

Importantly, even Officer Garcia—who believed Ms. Garcia had consented—

conceded that Ms. Garcia only asked questions about "the paperwork" rather than the

substance of the form's content or her rights. Tr. 1 at 119. Ms. Garcia's purely

logistical questions are consistent with her testimony that she was merely following

instructions. *See* Tr. 2 at 20-21 (Ms. Garcia's testimony that Officer Garcia "told [her]

to write [her] address here, to put [her] name here, to write this down, to write this

other thing down"). Considering this testimony alongside Ms. Garcia's testimony that

she did not read the form herself and reads at a fourth-grade level, the Court deems it more likely than not that Ms. Garcia neither read nor comprehended the form.

Officer Garcia's mistranslations also support a finding that Ms. Garcia did not understand her rights and reduce the efficacy of any explanations he may have provided. *Cf.* Tr. 1 at 120 (Officer Garcia's testimony that he "basically I told [Ms. Garcia] what's on the [consent form] just pretty much translating what was on the [form]"). As explained above, Officer Garcia translated the sentence "Yo he sido aconsejado de mi derecho a rehusar a este consentimiento antes de que cualquier búsqueda se conduzca" as "I have been advised of my right. . . to stop this consent before it begins, before it's conducted." Tr. 1 at 125. Assuming Officer Garcia explained the phrase consistent with his understanding of it, he could have led Ms. Garcia to believe that she had the right "to stop [her] consent before [her consent] begins." This statement does not clearly advise Ms. Garcia that she may refuse consent to *any search* before *the search* begins. Similarly, Officer Garcia translated the phrase "sin amenazas o promesas de ninguna clase" as "without threats or promises of any case," another confusing statement that fails to convey that consent must be given "without threats or promises *of any kind*." *Id.* The Court finds these mistranslations significant in light of credible testimony that Ms. Garcia reads Spanish at a fourth-grade level, relied on Officer Garcia to complete the form, and did not read the form carefully before signing it. *See* Tr. 2 at 9, 19, 20, 38. *See also* Tr. 1 at 132 (Officer Garcia's testimony that he and Ms. Garcia "read [the consent form] together

[but]. . . didn't read it verbatim"). Put simply, the Court finds that Ms. Garcia lacked the education and presence of mind to recognize where Officer Garcia's explanations and non-verbatim reading of the form differed from its actual content.

The Government resists these conclusions. Relying on *Merwin v. New York, N.H. & H.R., Co.*, 62 F.2d 803 (2d Cir. 1933), the Government contends that Ms. Garcia's "claim that she signed the consent-to-search form without reading [or understanding] it. . . [is] incredible as a matter of law." Gov. Post-Hrg. Br. at 11 n.4 (citing 62 F.2d at 804). This argument is unpersuasive for two reasons. First, *Merwin* did not deem any party's claim "incredible as a matter of law." Rather, the *Merwin* court found that a plaintiff's claim that he did not read a release form was "incredible" in light of evidence that he had had travelled to Boston to negotiate the sum he would receive in exchange for his signature, and that he accepted that sum (and other sums) of money. *Cf.* 62 F.2d at 804 (finding denial of knowledge "incredible" in light of "the circumstances of this case, with so many subsequent affirmations of knowledge"). Second, the facts are completely dissimilar. The New York, New Haven and Hartford Railroad Company did not send armed agents to Mr. Merwin's home to "get a consent" to its liability release, nor had it forced Mr. Merwin to lodge two of those agents the night before. *Cf.* Tr. 1 at 103, 188. *Merwin* is inapposite.

The Court therefore finds that Ms. Garcia was not properly advised of her constitutional rights—including her right to refuse consent. These facts weigh against voluntariness. *Schaefer*, 859 F. Supp. 2d at 407.

24

**(c)     Length of Detention**

The "length of detention" factor likewise favors a finding of involuntary

consent. Detention results when "the circumstances of an encounter are so

intimidating as to demonstrate that a reasonable person would have believed he was

not free to leave." *I.N.S. v. Delgado*, 466 U.S. 210, 216 (1984). Here, the Garcia

women clearly believed they needed to seek the officers' permission to leave or even

to go to the bathroom. Moreover, the presence of multiple armed police officers in the

apartment both overnight and at the moment of consent to the second search

contributed to the "intimidating" atmosphere of the encounter. *See United States v.*

*Long Huang You*, 198 F. Supp. 2d 393, 405 (S.D.N.Y. 2002) (a defendant "facing six

agents who were either standing inside his apartment or outside in the hallway" did

not give voluntary consent). Because armed officers remained in Ms. Garcia's

apartment for over twelve hours, and it was entirely reasonable for Ms. Garcia to

believe she could not leave during that time, the "length of detention factor" favors a

finding of involuntary consent.

**(d)     Other Factors**

The remaining factors paint a more mixed picture. Ms. Garcia was not subject

to custodial interrogation, and she was not handcuffed. The officers also never told

her that they could obtain a warrant. These facts support a finding of voluntariness.

By contrast, the "show of force" factor lightly favors a finding of involuntary

consent. The Court believes Argila's initial entry was a show of force since he

25

"shoved" past Ms. Garcia. *See You*, 198 F. Supp. 2d at 405. However, the Court gives little weight to this factor because Ms. Garcia signed the consent form many hours after Argila's entry.

The "prior refusal" and "prolonged questioning" factors played no role in the Court's analysis. Ms. Garcia was not interrogated.

**(e)      Totality of the Circumstances**

Having carefully considered the totality of the circumstances, the Court finds that Ms. Garcia's consent was not voluntary. While the Court is mindful of the challenges police officers face, it nonetheless finds that a reasonable officer would have known that Ms. Garcia was in no position to give voluntary consent to search.

**2.      Taint and Dissipation**

Because Ms. Garcia's consent was not voluntary, the Court need not decide whether that consent was also tainted by Argila's illegal entry. Nonetheless, for the sake of completeness, the Court finds that Ms. Garcia's consent was tainted.

In assessing whether a consent to search is tainted, the Court weighs four factors: "(1) the giving of *Miranda* warnings, (2) the temporal proximity of the illegal entry and the alleged consent, (3) the presence of intervening circumstances, and (4) the purpose and flagrancy of the official misconduct." *Snype*, 441 F.3d at 134. Because Ms. Garcia was not subject to custodial interrogation, only the latter three factors are relevant.

The second factor—temporal proximity—weighs against dissipation. Ms. Garcia signed a consent form more than twelve hours after the initial unlawful entry. Admittedly, this is a significantly larger gap than our precedent typically requires. *See, e.g.*, *id.* at 135 (twenty minutes sufficient to dissipate taint); *United States v. Oguns*, 921 F.2d 442, 447 (2d Cir. 1990) (delay "amounting to a few minutes" was sufficient in light of intervening circumstances); *cf. United States v. Valentine*, 591 F. Supp. 2d 238, 246 (E.D.N.Y. 2008) (brief delay was insufficient in the absence of intervening circumstances). However, because officers remained in Ms. Garcia's apartment until she consented, the Court believes that the harm resulting from Argila's entry persisted throughout the night and into the next morning. *See* Tr. 2 at 18 (Ms. Garcia's testimony that she had difficulty sleeping and feared that the officers were "thieves"). The Court cannot say that a reasonable person in Ms. Garcia's position would have believed that the passage of time "restored [their] liberty" or improved their situation in any way. *Cf. Snype*, 441 F.3d at 135 (temporal proximity supported dissipation where the consenting person's "own liberty was restored" in the interval).

The Government likewise fails to establish that the third factor—intervening circumstances—favors dissipation. The Government argues that (1) "the arrival of Ms. Garcia's daughter," (2) Ms. Garcia's "opportunity to spend the night alone in her bedroom," and (3) "the provision of a consent-to-search form" were all "intervening circumstances" that dissipate the taint of Argila's entry. Gov. Post-Hrg. Br. at 19.

Those arguments are unpersuasive. An intervening circumstance is relevant only if it "effectively replace[s] the fearful atmosphere of the initial forcible entry with relative calm." *Snype*, 441 F.3d at 135 (citing *United States v. Mapp*, 476 F.2d 67, 78 (2d Cir. 1973)). There is little evidence that this occurred. On the contrary, the Government and its witnesses described Ms. Garcia's daughter as "agitated" (making it unlikely that her presence calmed Ms. Garcia), and Ms. Garcia testified that her fear of intruders in her home made it difficult for her to sleep. *See* Tr. 1 at 22 (describing Ms. Garcia's daughter as "agitated"); Tr. 2 at 18 (testifying to difficulty sleeping). *Cf. Snype*, 441 F.3d at 135 (a finding of dissipation is appropriate when an intervening circumstance effects a "complete change in circumstances").

In support of its last argument, the Government cites *Oguns* for the proposition that the officers' provision of a consent form effectively dissipates the taint of Argila's illegal entry. Gov. Post-Hrg. Br. at 19 (citing 921 F.2d at 447-48). *Oguns* is distinguishable. Unlike Ms. Garcia, the *Oguns* defendant "spoke and understood English" and "carefully reread the form himself." 921 F.2d at 448. By contrast, the Court previously found that Ms. Garcia did not read and comprehend the form, and that she relied instead on Officer Garcia's imprecise explanations and procedural instructions. Provision of a consent form dissipates the taint of unlawful activity only if the form's contents are understood *Cf. id.* at 445, 447 (noting that the defendant did not "appear to have any difficulty understanding [the agent]" and emphasizing that agents "stopp[ed] after [reading] each right to ensure that [the defendant]

28

understood"). Here, the Government has not demonstrated that Ms. Garcia had such understanding.

Finally, the fourth factor—flagrancy and purpose of misconduct—weighs against dissipation. Police misconduct is "flagrant" if "the impropriety is obvious" and "purposeful" if "[it] was investigatory in design and purpose and executed in the hope something might turn up." *Murphy*, 703 F.3d at 192 (internal quotations and citations omitted). Here, it should have been "obvious" to Argila that he could not enter a home without the owner's consent or a warrant, and the Government has not claimed exigent circumstances. *Cf. Bustamonte*, 412 U.S. at 219 ("It is. . .*well settled* that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent") (emphasis added). Moreover, Argila testified that he initiated the encounter because he thought Ms. Garcia "had some sort of information as to what was going on," and the Court has already found that Ms. Garcia did not invite him into her home. From this testimony, the Court infers Argila entered the apartment because he believed doing so would advance his investigation, i.e. "in the hope something might turn up." *Murphy*, 703 F.3d at 192. His entry therefore served an "investigative purpose."

The Government fails to show dissipation of the taint under the totality of the circumstances. This taint provides an alternative basis for suppression.

## CONCLUSION

Because Officer Argila failed to activate his body camera, the nature of his encounter with Ms. Garcia may never be entirely clear. In such circumstances, the Court has no difficulty concluding that the Government has not borne its burden of proof to justify a warrantless search.

Accordingly, Garcia's motion to suppress is **GRANTED**.

**SO ORDERED.**

_/S/ Frederic Block
FREDERIC BLOCK
Senior United States District Judge

Brooklyn, New York
August 10, 2021